COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Beales, AtLee, Malveaux, Athey, Ortiz, Causey, Friedman,
            Chaney, Raphael, Lorish, Callins, White, Frucci and Bernhard
Argued at Richmond, Virginia


JORGE GUEVARA-MARTINEZ
                                                        MEMORANDUM OPINION[*] BY
v.       Record No. 1848-22-4                           JUDGE DOMINIQUE A. CALLINS
                                                        SEPTEMBER 2, 2025
ALEXANDRIA DEPARTMENT OF
  COMMUNITY AND HUMAN SERVICES


UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
Lisa B. Kemler, Judge

James C. Martin (Martin & Martin Law Firm, on briefs), for
appellant.

Helen T. Clemens; Luis Chinchilla, Guardian ad litem for the minor
child (Cheran Ivery; Meghan S. Roberts; Office of the City Attorney
for the City of Alexandria, on brief), for appellee.


The circuit court terminated the parental rights of Jorge Guevara-Martinez ("father")

pursuant to Code § 16.1-283(C)(2) and approved the Alexandria Department of Community and

Human Services' (the "Department") foster care plan with the permanent goal of adoption.

Father appealed to this Court contending, inter alia, that the circuit court violated his due process

rights, erroneously weighed "delays caused by the abduction, the pandemic, [and father's]

refusal to enter the United States illegally," and "circumvented" the requirements of the

Interstate Compact for the Placement of Children.  The majority of a divided panel of this Court

agreed with father and reversed the circuit court's judgment.  *Guevara-Martinez v. Alexandria*

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

*Dep't of Cmty. & Hum. Servs.*, No. 1848-22-4 (Va. Ct. App. Oct. 1, 2024); *Guevara-Martinez v. Alexandria Dep't of Cmty. & Hum. Servs.*, No. 1848-22-4 (Va. Ct. App. Nov. 6, 2024) (order). Upon the Department's petition for rehearing en banc, we now affirm the circuit court's judgment.

## BACKGROUND[1]

I.  The Child's Placement in Foster Care

Father and Maritza Ulloa Turcios ("mother") are the biological parents of the child who is the subject of this appeal.[2]  The family lived together in Honduras from the child's birth until July 2019, when mother left with the child, then five years old, for the United States.  In October 2019, the Department received reports alleging abuse and neglect by mother and concerns about her mental health.  Mother told the Department that she came to the United States to escape father's "constant physical and psychological abuse."

Despite the decline of mother's mental health, she initially refused services, including a mental health assessment.  Ultimately, however, the Department and mother entered into a safety plan ensuring mother would not be left alone with the child, and one of mother's friends agreed to be the child's caretaker.  When mother's mental health further declined, the Department sought a protective order for the child.

On October 30, 2019, the Juvenile and Domestic Relations District Court for the City of Alexandria (the "JDR court") entered a child protective order and temporary order awarding

---

[1] "On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)).  "To the extent that this opinion discusses facts found in sealed documents in the record, we unseal only those facts." *Brown v. Va. State Bar ex rel. Sixth Dist. Comm.*, 302 Va. 234, 240 n.2 (2023).

[2] In October 2021, mother signed a permanent entrustment agreement, which the Juvenile and Domestic Relations District Court for the City of Alexandria approved.

- 2 -

mother's friend sole legal and physical custody of the child. The JDR court subsequently adjudicated the child abused or neglected and entered a dispositional order. The record reflects that father was not present for the JDR court hearings, though he was represented by counsel.

Mother's friend was unable to care for the child beyond February 2020. He returned to foster care, and, on April 30, 2020, the JDR court entered an emergency removal order returning custody to the Department. A few days later, the JDR court found the child abused or neglected and entered a preliminary removal order. The Department referred to this as "formal foster care."

II. The Department's Assistance to Father

Throughout the child's placement in foster care, the Department took steps to ensure the child's proper care and to support father's engagement.[3] The Department requested that father participate in family partnership meetings and monthly treatment team meetings, that he participate in parent coaching services, and that he maintain contact with the child. The Department also requested that father cooperate with an international home study assessment.

The Department attempted to complete the home study with International Social Services. Due to the COVID-19 lockdown in Honduras, however, the Directorate for Children, Youth, and Family ("DINAF") could not complete a home study for father until about four months after the child entered foster care, in August 2020.

DINAF interviewed several of father's relatives, including his parents and older children. All recommended that the child remain in the United States and not return to father in Honduras.

---

[3] At oral argument the Department represented that it considered father as a placement option, yet the foster care plan contained in the record states that the Department "support[ed] keeping [the child's] relationship and connection to his father, but [did] not consider[] him as a placement option" since father "d[id] not have the parenting skills, resources, or stability to meet [the child's] basic needs," as well as due to his history of "aggression and domestic violence" as reflected in the DINAF home study report.

Father's parents told DINAF that father was not capable of parenting the child and providing for his needs. The child's grandfather, father's older sons, and one of mother's friends reported that mother and the child's grandmother were the primary caregivers for the child while he lived in Honduras. Father's older sons reported that they did not have a "good relationship" with father because he is "an aggressive person who abused (hit) their mother." One of mother's friends reported that the relationship between father and mother was "troubled," because father was "a dangerous person who physically and emotionally abused" mother. DINAF did not recommend placing the child with father because others described father as "an irresponsible and aggressive person who engaged in domestic violence against" mother.

Father participated virtually in family partnership meetings and several treatment team meetings, although he could not travel to the United States due to challenges related to the COVID-19 pandemic and the fact that he did not have a passport. At the meetings, father expressed that he wanted the child returned to his care. His participation in meetings, however, was inconsistent. Sometimes, father "listen[ed] in and ask[ed] questions," but at other times, he did "not show up," had "challenges with his connection," or was not in "a quiet environment."

The Department initially referred father to parent coaching and parent support services in a "rural city" 45 minutes away from his home in Honduras, but father refused to participate in the services due to the distance and unreliable bus transportation. Father told Department personnel that seeking parent coaching services was "too much effort," as "Tuesdays are for him to take off from work and relax his body" and on other days, he did not return home until 7:00 or 8:00 p.m. As a result, the Department arranged for father to participate virtually in parent coaching through the Multicultural Clinical Center, which also supervised his virtual visits. Although father "consistently" participated in phone and video calls with the child, the conversations caused the child "distress" because father "often" discussed the child's return to Honduras. The Department

determined that father required "assistance with appropriately engaging with [the child] and maintaining a positive relationship with him."

The Department explored other relative placement options. A paternal uncle and aunt in Texas, with whom the child's older brother lived, expressed interest in serving as the child's caregivers. Although the Department arranged weekly contacts between the child and these relatives, and facilitated visits in both Texas and Virginia, it could not, under the Interstate Compact on the Placement of Children, place the child with the Texas relatives unless placement occurred concurrent with an adoption.

The Department did not recommend placing the child with father because of father's "history of aggression and domestic violence" and his failure to address the Department's concerns. Thus, it sought to change the foster care goal to adoption.

III. The Termination of Father's Parental Rights

In October 2021, the Department petitioned the JDR court to terminate father's parental rights and to approve the foster care plan with the goal of adoption and relative placement.[4] Father participated in the JDR court termination hearing by telephone.[5] The JDR court granted the Department's petition for termination and approved the foster care plan. Father appealed.

---

[4] The guardian ad litem originally appointed in this case participated at all stages, from proceedings in the JDR court through this rehearing en banc, and submitted a report "to achieve [the] goal of defending the best interests of the concerned child." In that report, the guardian ad litem continues to recommend that it is in the best interests of the child that father's rights be terminated.

[5] The JDR court denied father's motion for a continuance to allow him to appear in person, noting that notice of the hearing was "nearly 3 yrs [sic] old and no demonstrable efforts have been made to appear in person."

On November 14, 2022, the parties appeared before the circuit court, including father, who had just received a visa a few days prior to the hearing.[6]  The Department presented evidence that when it first became involved with the family, the child was "way past due for his physical exams, [and] his dental care."  By the time of the hearing, the child, then eight years old, was healthy and "responding really well in his foster home."  He was "doing really well in school," his mental health had improved, and he was "actively engaging in therapy to address the traumas that he had endured."

The Department presented evidence that father did not apply the parent coaching skills he learned.  During visits, father needed "constant" reminders to ask the child questions, engage with him, and have "child-appropriate conversations" with him.  Although father repeatedly stated that he wanted the child returned to him, the Department remained concerned about the "ongoing reports of his abusive history" and father's lack of understanding of the child's needs.

The Department also presented evidence from C.G.,[7] father's 19-year-old son.  Before moving to the United States, C.G. lived in Honduras with father, mother, the child, and another brother.  While they lived together, C.G. "[f]requently" witnessed father physically and verbally abusing mother.  Father "hit" mother and insulted her, sometimes in front of the child.  C.G. was present once when the child, then two years old, witnessed father "grab[] . . . mother by the neck" and "thr[o]w her on the sofa."  Father then "slapped" mother, and the child "started crying."  After the child reported the assault to his paternal grandparents, father made the child kneel for "about ten minutes."  C.G. testified that father also hit him with a belt and with a rope and that father once "broke [his] mother's eyebrow."

---

[6] At the hearing, father testified that he applied for a U.S. travel visa two months before the hearing and that it was issued on November 9, 2022, five days before the hearing.

[7] We use initials to protect the privacy of C.G., who, like the child, is a victim of domestic violence.

After the Department rested, father moved to strike. The circuit court denied father's motion, and then father presented evidence on his own behalf. Father denied abusing mother and asserted that they enjoyed an "excellent" relationship before she "abandoned the home." In 2017, mother and C.G. left Honduras to live in Mexico. According to father, when mother returned to Honduras seven months later, she stayed until the summer of 2019, then "took the child" out of school without telling father. The same day, the child's teacher called father and informed him that mother took the child out of school. Father "thought [mother] was just taking him out for a little while," and did not come to the "realization" that something was wrong until two days later, at which point he reported the incident to DINAF. Father did not know where the child was until mother's friend contacted him months later to request that he "sign something" so that she could "have the child"; father refused. When the Department contacted father six months later, he indicated to them that he filed "a report with immigration to have [the child] returned to Honduras" and asked the Department to return the child to him.

Father described himself as an "[e]xemplary father" to the child. He denied hitting mother, forcing the child to kneel, or striking C.G. with a belt or a rope. Father claimed that mother "kidnap[p]ed [the child] from kindergarten" and left for the United States.[8] Father testified that, prior to the child's removal to the United States, he and the child played ball, bathed in the river, and went to the store and a local restaurant together. When father "had time," he took the child to and from school. Father also testified that he took the child to medical appointments and the

_____

[8] Our dissenting colleagues repeatedly emphasize father's claim that the child was "kidnapped," and in so doing, ignore well-established principles requiring us, on appeal, to view the facts in the light most favorable to the prevailing party—here, the Department. *Joyce*, 75 Va. App. at 695. In that light, the evidence establishes that mother fled with the child to the United States to escape father's abuse. The only evidence of kidnapping is father's bald assertion of the same, and, notably, the circuit court disagreed.

hospital when needed.  Father reiterated that he wanted to take the child home to Honduras, but if he could not do so, he was willing to "seek political asylum in [the United States]."

At the conclusion of all the evidence, the circuit court terminated father's parental rights under Code § 16.1-283(C)(2) and approved the Department's foster care plan with the goal of adoption and relative placement.  The court acknowledged father's efforts to file a complaint with DINAF for the return of the child, as well as his efforts in coming to the United States for the termination hearing.  The court also recognized father's efforts to engage in fun activities with the child, take him to medical appointments, and provide for the family financially.  The circuit court nonetheless found "equally compelling" that "not one person," including father's own parents and his older children, thought that father was "fit to care" for the child.  The court credited C.G.'s testimony of father's "physical violence" and "completely inappropriate" punishment of the child. The circuit court held that the child's best interests required termination of father's parental rights. Father appealed to this Court.

A divided panel of this Court reversed the circuit court's judgment and held that the circuit court erred in terminating father's parental rights under Code § 16.1-283(C)(2).  *Guevara-Martinez v. Alexandria Dep't of Cmty. & Hum. Servs.*, No. 1848-22-4 (Va. Ct. App. Oct. 1, 2024).  The Department then petitioned the Court "to rehear Mr. Guevara's second assignment of error" en banc, but also requested that the Court rehear en banc father's third and fourth assignments of error "if necessary, as a reversal on the second assignment of error may not entirely resolve the

case."[9]  We granted "rehearing en banc on the issue(s) raised in the petition."[10]

*Guevara-Martinez v. Alexandria Dep't of Cmty. & Hum. Servs.*, No. 1848-22-4 (Va. Ct. App.

Nov. 6, 2024) (order).

## ANALYSIS

In the sole assignment of error before this Court, father contends that "there was no clear

and convincing evidence [that he] was an unfit parent, thus violating his Due Process rights

under the Fourteenth Amendment to the United States Constitution, Article I Section 11 of the

---

[9] This Court's grant of "a rehearing en banc on the issue(s) raised in the petition," includes all three assignments of error presented in the Department's petition.  *See* Rule 5A:35(b)(1) ("This Court may grant a petition for rehearing en banc in whole or in part. . . . [T]he en banc Court is limited to those matters raised in the petition for rehearing en banc for which the Court granted rehearing and those matters included in the grant by this Court on its own motion.").  In his reply brief, father characterized the second assignment of error as "the sole *en banc* issue" and failed to address in his briefs the third and fourth assignments. Therefore, father's third and fourth assignments of error are waived, and we do not reach them. *See* Rule 5A:20(c)(1) ("Only assignments of error listed in the brief will be noticed by this Court."); *see also Dowdy v. Commonwealth*, 278 Va. 577, 590 n.14 (2009) (finding that the appellant waived various assignments of error on appeal by omitting them from his opening brief).

[10] It cannot be sufficiently emphasized that this case concerns the best interests of an eight-year-old child.  This is our primary consideration and the sole basis for our decision today.

But whether it is the best interests of a child, the liberty interests of an incarcerated individual, or the financial interests of parties to a civil dispute, there is no matter that comes before this Court that is not thoughtfully and carefully considered by each of its members.

Code § 17.1-402(D) provides that the Court of Appeals "may sit en banc upon its own motion at any time or upon the petition of any party, in *any case* in which a majority of the court determines *it is appropriate to do so*."  (Emphases added).  As our dissenting colleagues acknowledge, this hardly limits us to any set of "illustrative" circumstances.  To the contrary, this broad standard is a boundary that extends far—even as far as the need for error correction when the stakes in a nonprecedential decision are particularly high.  So, where the Court has already determined that it is appropriate to rehear a case en banc on its merits, the deliberative calculus of the Court in coming to that determination is no longer an issue warranting debate.

Virginia Constitution, and Section 16.1-283 of the Code of Virginia."[11, 12]  Father argues that he complied with all the Department's requirements by completing a home study; participating in parent coaching services, virtual family partnership meetings, and treatment meetings; and by staying in contact with the child as best as he could.  Father contends that the circuit court was without evidence to support its judgment.

---

[11] Father, without leave, altered his second assignment of error in his en banc opening brief.  Upon rehearing en banc, "[t]he appellant may not change an assignment of error from the one assigned before the panel but may seek leave of Court to make technical corrections or non-substantive changes that do not prejudice the appellee."  Rule 5A:35(b)(2).  Because father altered his assignment of error without leave of Court, we evaluate his assignment of error as originally presented to the panel and as granted by this Court en banc.  *See Hamilton Dev. Co. v. Broad Rock Club*, 248 Va. 40, 44 (1994) ("The language of an assignment of error may not be changed, especially when the assignment is set forth in the order of this Court awarding the appeal."); *see also Santen v. Tuthill*, 265 Va. 492, 497 n.4 (2003) ("[A]n appellant may not change the wording of an assignment of error.").

[12] Father has failed to preserve the portion of his assignment of error which contends that the circuit court violated his due process rights.  Even constitutional arguments must be properly raised and preserved to avoid waiver on appeal.  *See Arrington v. Commonwealth*, 53 Va. App. 635, 641 (2009) ("Rule 5A:18 applies to bar even constitutional claims." (quoting *Farnsworth v. Commonwealth*, 43 Va. App. 490, 500 (2004))).  On brief, father acknowledges that his due process argument was only mentioned in a statement of objections filed more than two weeks after the circuit court entered the permanency planning order.  Father did not seek a ruling on his objections prior to this appeal, filed just three days after he filed the statement of objections.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty *at the time of the ruling*, except for good cause shown or to enable this Court to attain the ends of justice."  Rule 5A:18 (emphasis added).  "The purpose of this contemporaneous objection requirement is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials."  *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015).  An objection "must be both specific and timely—so that the trial judge would know the particular point being made in time to do something about it."  *Hogle v. Commonwealth*, 75 Va. App. 743, 755 (2022) (quoting *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019)).  If an appellant "fails to timely and specifically object, he waives his argument on appeal."  *Id.*

Father did not afford the circuit court an opportunity to know and rule on his due process argument.  Although father ostensibly concedes his failure of preservation—stating that his assignment of error "was properly preserved *to the extent of the statutory issue*," (emphasis added)—he also contends that "[s]ince the constitutional violations are not necessary to the decision of the case . . . reliance on them is not needed."  Father waives his due process argument, and, thus, we do not reach it.

The Department argues that the evidence presented, which established father's history of violence, his strained relationship with the child, and his failure to correct the conditions that led to or required continuation of his child's placement in foster care, was sufficient to support the circuit court's judgment that termination was in the child's best interest and that father failed to remedy the circumstances requiring the child to remain in foster care.

I. Standard of Review

A circuit court "retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 266 (2005) (quoting *Farley v. Farley*, 9 Va. App. 326, 328 (1990)). "On review of a trial court's decision regarding the termination of parental rights, we presume the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 699 (2022) (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). Therefore, its "decision will not be disturbed on appeal unless it committed an abuse of discretion, or unless its decision was plainly wrong or without evidence to support it."[13] *Id.* (quoting *Hardy*, 42 Va. App. at 552). Further, when a court hears evidence ore tenus, its findings "will not be disturbed on appeal unless plainly wrong or without evidence to support it."

_____

[13] Whether the evidence presented at the termination hearing regarding the child's best interests reached the "clear and convincing" threshold is not a determination that we, as an appellate court, make sitting in review of the circuit court's judgment. Indeed, a circuit court, "[i]n its capacity as factfinder, . . . retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Toms*, 46 Va. App. at 266). Because the circuit court concluded that the evidence met the clear and convincing threshold, the *only* consideration before us is whether the circuit court's findings were plainly wrong or without evidence to support them. *See id.* ("The [circuit] court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991))). So, although our dissenting colleagues correctly note the proper evidentiary standard, they misconstrue our role on review.

*Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting

*Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).  And "[t]he

credibility of the witnesses and the weight accorded the evidence are matters solely for the fact

finder who has the opportunity to see and hear that evidence as it is presented."  *Id.* (alteration in

original) (quoting *Harvey v. Flockhart*, 65 Va. App. 131, 146 (2015)).

II.  Code § 16.1-283(C)(2)

Virginia law "indicate[s] a respect for the natural bond between children and their natural

parents."  *Weaver v. Roanoke Dep't of Hum. Res.*, 220 Va. 921, 926 (1980).  Indeed, the "law

presumes that the child's best interests will be served when in the custody of its parent," and

parents "retain a vital interest in preventing the irretrievable destruction of their family life."

*Joyce*, 75 Va. App. at 700 (first quoting *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 44

(2014); and then quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)).  The termination of this

bond, then, "is a grave proceeding" as "[a] court order terminating parental rights renders the

parent 'a legal stranger to the child' and severs 'all parental rights.'"  *Weaver*, 220 Va. at 926

(quoting *Shank v. Dep't of Soc. Servs.*, 217 Va. 506, 509 (1976)).  For these reasons, the

circumstances necessitating severance of the parent-child bond are rare.  *See id.*

However rare, our legislature determined that severance of the parent-child relationship

may be appropriate under certain circumstances.  Termination of parental rights is permitted

where a "court finds, based upon clear and convincing evidence, that it is in the best interest of

the child and that:"

> The parent or parents, without good cause, have been unwilling or
> unable within a reasonable period of time not to exceed 12 months
> from the date the child was placed in foster care to remedy
> substantially the conditions which led to or required continuation
> of the child's foster care placement, notwithstanding the

reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2).

Stated differently, a [circuit] court must make three separate findings by clear and convincing evidence: (1) that termination is in the child's best interest, (2) that, without good cause, the parent failed to substantially remedy the conditions that led to, or required continuation of, the child's placement in foster care, and (3) that the Department made reasonable and appropriate efforts to help the parent remedy those conditions.

*Joyce*, 75 Va. App. at 701. Decisions under Code § 16.1-283(C)(2) "hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (quoting *Toms*, 46 Va. App. at 271). That is, "subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services." *Toms*, 46 Va. App. at 271. So long as the circuit court's determination is supported by evidence, its judgment will not be reversed.

Father challenges two of the circuit court's findings under Code § 16.1-283(C)(2): first, that termination was in the child's best interest, and second, that "without good cause," father failed to "remedy substantially the conditions which led to or required continuation of the child's foster care placement." Code § 16.1-283(C)(2).[14] We address each in turn.

A. Best Interests of the Child

Father argues that termination of his parental rights was not in the child's best interests and challenges the allegations of abuse, contending that mother and C.G. were unreliable

---

[14] Father does not challenge the circuit court's third finding under the statute, namely, that the Department "made reasonable and appropriate efforts to help [father] remedy" the conditions "that led to, or required continuation of," the child's placement in foster care. *Joyce*, 75 Va. App. at 701.

- 13 -

witnesses. Father further argues that the Department's "weak evidence of prior abuse was not severe enough" to terminate his parental rights and that it was in the child's best interests to return him to his care. The Department contends that father's history of abuse and "dubious relationship" with the child was sufficient evidence to support the circuit court's conclusion that termination served the child's best interest. We agree with the Department.

The record reflects that the Department submitted into evidence DINAF's home study report, which included summaries of interviews with father's parents, children, and friends of the family. Based on the evidence presented, the circuit court found that:

> [N]ot one person who was interviewed . . . gave the opinion that [father was] fit to care for [the child], that [father] understood his or could provide for his developmental, his emotional, his educational, his medical needs. And in fact, the home study was replete with statements about the physical and verbal aggression exhibited by [father].

Notably, all of the interviewees recommended that the child not return to father's care in Honduras. The DINAF report revealed that father's children described him as an "aggressive person who abused (hit) their mother," and stated that they do not have a good relationship with him. One family friend labeled father as irresponsible and "a dangerous person who physically and emotionally abused" mother. Father's parents expressed their belief that father did not have "the necessary conditions to be able to take care" of the child.[15] Accordingly, the DINAF home study report did not recommend placing the child with father because his relatives and family

---

[15] According to the DINAF home study report, father's parents also expressed their desire that the child remain in the United States. The record does not reflect that the circuit court considered the grandparents' desire in its determination of the child's best interests or of father's willingness or ability to substantially remedy the conditions which led to the Department's custody of the child. *See Joyce*, 75 Va. App. at 699 ("[W]e presume the trial court . . . 'considered the statutory requirements, and made its determination based on the child's best interests.'" (quoting *Hardy*, 42 Va. App. at 552)).

friends described him as "an irresponsible and aggressive person who engaged in domestic violence against" mother.

In addition to the DINAF home study report, the circuit court heard ore tenus testimony from C.G., another child in common with father and mother. C.G. testified to witnessing father's abuse while living with father, mother, and his other siblings in Honduras, including father's "[f]requent[]" physical and verbal abuse of mother, sometimes in the presence of the child. C.G. testified to the assaults he sustained at father's hand—including being hit with a belt and a rope. C.G. described witnessing father grab his mother by the neck and throw her on the sofa before slapping her. Significantly, C.G. testified that the child also witnessed this incident, and it caused him to cry. According to C.G., when father learned that the child told his grandparents what he saw father do to mother, father punished the child by forcing the then two-year-old child to kneel for about ten minutes.

In the light most favorable to the Department, the evidence was sufficient to support the circuit court's finding that it was in the child's best interest to terminate father's parental rights under Code § 16.1-283(C)(2). Although father disputes the credibility of C.G.'s testimony and denies that he ever abused the child or mother, "[i]t is well established that the trier of fact ascertains a witness'[s] credibility, determines the weight to be given to their testimony, and has discretion to accept or reject any of the witness'[s] testimony." *Layman v. Layman*, 62 Va. App. 134, 137 (2013) (quoting *Street v. Street*, 25 Va. App. 380, 387 (1997) (en banc)). And "[t]his Court is bound by the credibility findings of the circuit court." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 339 (2013). Here, the circuit court clearly rejected father's testimony that he was an "[e]xemplary father," and gave considerable weight to the DINAF home study report and the testimony presented at the hearing. *See Simms*, 74 Va. App. at 470. Indeed, the DINAF home study report warned ominously that it was "important to mention that what has

- 15 -

been declared by [father] is not valid since the people who were interviewed have described [father] as an irresponsible and aggressive person."

Moreover, the child had been in foster care for approximately three years at the time of the circuit court hearing. "Code § 16.1-283(C)(2)'s twelve-month time limit 'was designed to prevent an indeterminate state of foster care "drift" and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement.'" *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 171 (2014) (quoting *L.G. v. Amherst Cnty. Dep't of Soc. Servs.*, 41 Va. App. 51, 56 (2003)). "[I]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 568 n.6 (2018) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)). The circuit court "retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" *Toms*, 46 Va. App. at 266 (quoting *Farley*, 9 Va. App. at 328). Given the evidence of father's history of abuse, the DINAF report recommending that the child not return to father's care, and the length of time the child had already spent in foster care, the circuit court did not err in finding that the best interests of the child would be served by terminating father's rights.

B.  Remedying Substantially the Conditions

Father further contends that he was not "without good cause . . . unwilling or unable . . . to remedy substantially the conditions which led to or required continuation of the child's foster care placement." Code § 16.1-283(C)(2). He argues that he complied with all the Department's conditions for services, including completing the home study, attending parent coaching services, virtual family partnership meetings, and treatment team meetings, and remaining in contact with the child. The Department contends that father refused certain services and failed to remedy the

circumstances causing the child to be in foster care, including his inability to improve his communications or relationship with the child. We hold that there is sufficient evidence to support the circuit court's finding.

Code § 16.1-283(C)(2) permits a court to terminate parental rights where a parent proves "unwilling or unable" to "remedy substantially the conditions which led to *or required continuation of* the child's foster care placement." (Emphasis added). It is undisputed that mother created the condition which led to the child's initial placement into foster care. Mother removed the child to the United States. And due to mother's mental health decline, the JDR court adjudicated the child "abused or neglected" based on its finding that he was "without parental care . . . caused by the unreasonable absence or the mental or physical incapacity of the child's parent."

Yet, as we have previously recognized, Code § 16.1-283(C) hinges not on the magnitude of the problem which led to the Department's intervention, but on the extent to which a parent acts to remedy the conditions from which the child was protected. *See Yafi*, 69 Va. App. at 552. With mother's accusations of father's past abuse, which were corroborated by others, the Department determined initially that father was not a placement option. The "condition" father needed to remedy substantially was that of an abusive environment. But throughout the record in this case, father denies such condition even exists. Indeed, father claimed to be an "[e]xemplary" parent and denied that he abused mother or C.G. or punished the child inappropriately. He maintained his denials even when confronted with the descriptions of his aggression and

- 17 -

domestic violence. Thus, father can hardly be deemed to have remedied a condition he denies existed.[16]

Father's failure to remedy is further evidenced by his lackluster participation in the Department's services. When the Department initially referred father to parent coaching and parent support services, he refused to participate, citing distance, unreliable bus transportation, and, according to the DINAF report, that "it would be too much effort to seek the parent coaching services." As a result, the Department arranged for father to participate in virtual parent coaching services. The evidence established that although father participated in meetings, his participation was "not consistent." Sometimes father "listen[ed] in and ask[ed] questions," but other times he failed to appear, was in a distracting environment, or had connectivity challenges. Additionally, during visits, father needed "constant" reminders to ask the child questions, to have "child-appropriate conversations" with him, and even to engage with the child. What is more, the Department expressed concern that the calls between father and the child caused the child "distress." Further, father basically refused to utilize the parent coaching skills he had learned through the provided services. In sum, although father sometimes participated in these services, underlying father's perfunctory participation is evidence of his refusal to make

---

[16] We find our dissenting colleagues' comparison of this case to *Thach v. Arlington County Department of Human Services*, 63 Va. App. 157 (2014), and *Fairfax County Department of Family Services v. Ibrahim*, No. 0821-00-4 (Va. Ct. App. Dec. 19, 2000), misguided. In *Thach*, this Court determined that, in the acknowledged absence of abuse or neglect by a father, "[t]he circuit court clearly relied heavily on [father's] immigration status and insufficient employment verification," and nothing more, to conclude his unfitness. 63 Va. App. at 173. In *Ibrahim*, we held that the circuit court erred in terminating a father's parental rights where the department "offered no services to the father to assist in having the children returned to him." No. 0821-00-4, slip op. at 5. Here, evidence established that father's parents, his children, and the child's mother all alleged father was aggressive, abusive, and had assaulted mother in the child's presence, that he had inappropriately disciplined the child, and that, despite being offered multiple services over an extended period, he had failed to demonstrate a genuine effort to remedy the conditions which contributed to his separation from the child. The only thread of commonality between *Thach*, *Ibrahim*, and this case is that each features a non-U.S. citizen parent, and that fact alone is insufficient to render the cases analogous.

almost any real changes and a lack of effort. "The law does not require the [Department] to force its services upon an unwilling or disinterested parent." *Barkey v. Commonwealth, Alexandria Dep't of Hum. Servs., Div. of Soc. Servs.*, 2 Va. App. 662, 670 (1986).

Given that termination decisions under subsection C hinge "on the demonstrated failure of the parent to make reasonable changes," *Yafi*, 69 Va. App. at 552 (quoting *Toms*, 46 Va. App. at 271), and taking the evidence in the light most favorable to the Department, we cannot say that the circuit court erred in its judgment. The record contained sufficient evidence to support its conclusion that father had not substantially remedied the conditions that required continuing the child's placement in foster care.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*

Athey, J., with whom Causey, Chaney, and Bernhard, JJ., join, dissenting.

This Court has previously noted that by enacting Code § 16.1-283, "the legislature has devised a thorough and detailed statutory scheme for courts to follow in terminating residual parental rights, . . . render[ing] the proceeding to terminate residual parental rights 'a chancery case sui generis.'" *Willis v. Gamez*, 20 Va. App. 75, 83 (1995) (quoting *Reid v. Reid*, 245 Va. 409, 413 (1993)). The term "sui generis" is defined as "[o]f its own kind or class; unique or peculiar." *Sui Generis*, *Black's Law Dictionary* (11th ed. 2019). This phrase appropriately describes termination of parental rights proceedings, in part, because the proceedings delve into our ancient natural and constitutional rights as juxtaposed against the human condition and its shortcomings.[17] Here, the Alexandria Department of Community and Human Services ("Department") imposed conditions upon a lawful citizen of Honduras after his kidnapped child came into the custody of the Department when abandoned by the child's mother. Hence, the facts here are sui generis when compared to previous termination petitions that have come before this Court. Thus, based upon these unique and peculiar facts, I would have reversed the decision of the Circuit Court of the City of Alexandria ("circuit court") granting the Department's petition

---

[17] *Compare Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (noting that the right to raise one's children has been deemed an "essential right," and a "basic civil right of man"), *with Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 319 (2013) ("When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991))), *and Blisset's Case*, Lofft, 748, 748-49, 98 Eng. Rep. 899, 899 (K.B. 1774) (Mansfield, L.) (enumerating the underpinnings for the best interests of the child standard), *and* George Tucker, *Blackstone's Commentaries with Notes of Reference to the Constitution and Laws of the Federal Government of the United States and the Commonwealth of Virginia* 446 (Birch & Small 1803) ("The duty of parents to provide for the maintenance of their children is a principle of natural law."), *and* 2 James Kent, *Commentaries on American Law* 169 (O. Halsted 1827) (noting that "[t]he rights of parents result from their duties [to their children]," and "the law has given them such authority"), *and* John Locke, *Second Treatise of Government* Ch. 6, § 71 (Hackett Publ'g Co., Inc. 1980) (1690) ("This shews the reason how it comes to pass, that parents in societies, where they themselves are subjects, retain a power over their children, and have as much right to their subjection, as those who are in the state of nature.").

seeking the termination of father's residual parental rights. In addition, since I agree with the outcome in Judge Causey's separate dissent, I join it. I further join Judge Bernhard's separate dissent since I generally agree with Judge Bernhard's non-exhaustive list of criteria which should be present when granting en banc review. I also join his separate dissent because based on that criterion, I declined to support granting rehearing en banc in this case. Finally, I write separately, joined by several of my colleagues, since we agree that the evidence in the record before the circuit court was insufficient for the circuit court to rule by clear and convincing evidence that this Honduran father failed to remedy the conditions that brought his minor child into the custody of the Department.[18]

Initially, we acknowledge that at the time the child came into the Department's custody, father's prior history of aggression against his wife and corporal punishment in relation to his older children may not have shown him to be a model parent. However, we disagree that the Department's primarily *historical* evidence of father's prior aggressive behavior proved by clear and convincing evidence that father was unable or unwilling to remedy the conditions imposed upon him by the Department. In addition, the record before the circuit court peculiarly and

---

[18] We agree with the majority that "to comply with Rule 5A:20(c)(2) and Rule 5A:18, [the litigant] must identify an erroneous ruling, finding, or failure to rule *by the trial court*[] [as] [t]he Rules of the Supreme Court are not surplusage, nor are they a menu from which litigants may freely pick and choose." *Barnes v. Commonwealth*, 80 Va. App. 588, 595 (2024). However, though we cannot endorse a litigant's decision to amend his assignment of error without leave of this Court, as father contended before the panel below that the evidence in the record was insufficient to terminate his parental rights under Code § 16.1-283(C), we conclude this issue is not waived and it is properly before this Court on either his panel assignments of error or those he advances en banc. Our Rules "require[] a litigant to *specifically* assert in the trial court the legal theory he seeks to raise on appeal." *Asfaw v. Commonwealth*, 56 Va. App. 158, 165 n.4 (2010) (applying Rule 5A:18). And we can find no "clear and unmistakable proof of [father's] . . . intention to waive" his sufficiency challenge. *King v. Commonwealth*, 264 Va. 576, 581 (2002) (quoting *Chawla v. Burgerbusters, Inc.*, 255 Va. 616, 623 (1998) (noting that when a party makes an objection sufficient to preserve an issue for appeal, this Court will only find waiver where there is such proof as "the essence of waiver is voluntary choice")). Thus, we would find father's sufficiency challenge to be still properly before the Court.

importantly reflected that his minor child illegally entered this country as a result of a parental kidnapping by the child's mother. Hence, this Honduran father, who was victimized by the parental kidnapping, was forced to participate in parenting services originating in the United States solely by video while he continued to legally reside in a remote village in Honduras during the global COVID-19 pandemic. After the father was finally able to obtain a visa and attend the final termination hearing to request additional time to comply with the Department's mandated services, the circuit court denied the father an opportunity to participate in further services with his son in person. Thus, we would have held that the circuit court's decision to terminate father's parental rights was premature given the unique and peculiar circumstances present in this case. Finally, as a result of the circuit court's decision to terminate the parental rights of the child's Honduran father, this case raises ancillary concerns far beyond those present in typical cases where the Department is seeking the termination of parental rights.

Ultimately, this case involves the custody of an illegally transported Honduran child brought to Alexandria, Virginia by his Honduran mother without his Honduran father's consent. Based upon statements made by the child's mother while she was being institutionalized in Alexandria for mental illness resulting in the abuse and neglect of her child, the Department challenged the Honduran father's suitability as a parental placement. In fact, the record reflects that the illegally transported migrant child was present in Alexandria, Virginia, because his Honduran mother kidnapped him from the Honduran home they shared with his father in a remote village in Honduras. The child's mother, without father's consent, transported their son over 2000 miles before illegally crossing into the United States. Mother and son then continued to travel to Alexandria to rendezvous with a man mother had corresponded with over the internet who had promised her a romantic relationship, all of these facts being documented in a report filed with the Department by Honduras's Directorate for Children, Youth, and Family ("DINAF").

Father, upon discovering his minor son was missing from their home, reported the child's kidnapping to DINAF and sought assistance from the "COFRADIO," a non-governmental organization, to secure the child's return to their home in Honduras. Upon arriving in Alexandria, mother's prior mental health issues exacerbated, slowly spiraling out of control and eventually leading to her being institutionalized. Based upon the abuse and neglect visited upon the son by his mother, the child came into the custody of the Department. The Department initially attempted to place the child back with his father in Honduras, however, the Department chose to end their attempted placement based upon a statement by the mentally impaired mother, warning against returning the child to Honduras because her husband had allegedly been domestically violent toward her. As a result, the Department accepted custody of the child from a friend of the mother living in Alexandria after the mother's friend agreed with the mother's assessment of the father. Hence, based solely upon the mentally impaired mother's statement, the Department determined that father was an inappropriate placement option, and the child was subsequently placed in foster care. Moreover, even though it was the mental impairment of the mother and the associated abuse and neglect of the child that led to the child initially coming into the custody of the Department, based upon the mother's accusations of violence and aggression toward her, the Department decided that the father lacked parental skills and deemed that his lack of parental skills were in need of remedying before transferring custody of the child back to his father in Honduras.

To remedy the alleged conditions for which the child came into the custody of the Department (i.e. mother's mental impairment and abusive treatment of the child), the Department established conditions that his Honduran father had to meet before he could be reunited with his child. The conditions included father's participation via video in family partnership meetings and monthly treatment team meetings. The father was also required to

maintain contact by video with the child and participate in parent coaching services. He was further required to cooperate with a study of his home located in his remote village in Honduras. Only if these conditions were met to the satisfaction of the Department would the father be deemed sufficiently rehabilitated to permit the return of his kidnapped child. Having no passport or visa, father could not legally travel to the United States to engage in person in the required meetings or to personally visit with his child due, in part, to travel restrictions related to the budding COVID-19 pandemic. Thus, all the "remedying" father could do was solely by remote means and dependent on the technical conditions available to him in Honduras during the time various meetings were scheduled. Ignored in the Department's various requirements was the fact that these conditions were, at heart, related to his alleged prior conduct in their home in Honduras as well as to his personal relationship with his older child. Remedying these conditions traditionally requires some personal contact with the child, which was not legally permitted given the unique and peculiar circumstances related to the father and son's citizenship as well as the travel restrictions present during the COVID-19 pandemic.

In evaluating father's prior conduct, we acknowledge that, as adduced at the termination hearing, there was evidence in the record before the circuit court that *prior* to the child coming into the Department's custody, father had allegedly engaged in aggressive conduct including domestic violence toward the child's mother and toward one of his older sons living in Honduras. We also acknowledge that the evidence reflected that father allegedly had his child kneel down in a corner of his home in Honduras as punishment on one occasion. We also do not dispute the majority's observation that this "history of aggression and domestic violence" found in the DINAF home study preliminarily impacted his initial suitability as a parental placement. However, we cannot find by clear and convincing evidence that father had not "remedied his condition" through his consistent participation by video in the prescribed services in a manner

sufficient to forestall termination of his parental rights under Code § 16.1-283(C)(2).  In support,

we contend that the text of this particular statutory provision suggests that his termination was

improper at the time it occurred due to the factual peculiarities before the circuit court.

Code § 16.1-283(C)(2) authorizes a court to terminate a parent's rights if:

> The parent or parents, without good cause, have been unwilling or
> unable within a reasonable period of time not to exceed 12 months
> from the date the child was placed in foster care to *remedy*
> *substantially* the conditions *which led to or required* continuation
> of the child's foster care placement, notwithstanding the
> reasonable and appropriate efforts of social, medical, mental health
> or other rehabilitative agencies to such end.

(Emphases added).  We have further enumerated that in order to terminate a parent's rights under

this provision, the circuit court must make:

> three separate findings by clear and convincing evidence: (1) that
> termination is in the child's best interest, (2) that, without good
> cause, the parent failed to substantially remedy the conditions that
> led to, or required continuation of, the child's placement in foster
> care, and (3) that the Department made reasonable and appropriate
> efforts to help the parent remedy those conditions.

*Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 701 (2022).  None of these

findings are optional.[19]  *See Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157,

170 (2014) (noting that even "[i]f the circuit court finds that termination is in the best interest of

the child, the circuit court may only terminate parental rights" if it also finds clear and

convincing evidence that the Department took reasonable efforts to help assist the parent and that

the parent failed to remedy the conditions in question).  And "[s]tatutes terminating the legal

relationship between parent and child should be interpreted consistently with the governmental

---

[19] By finding that the Department did not present clear and convincing evidence that father did not substantially remedy the conditions that caused the child to enter foster care, we would decline to opine on the other two elements to address this appeal on the "best and narrowest grounds available."  *Harris v. Wash. & Lee Univ.*, 82 Va. App. 175, 205 n.15 (2024).

objective of preserving, when possible, the parent-child relationship." *Weaver v. Roanoke Dep't of Hum. Res.*, 220 Va. 921, 926 (1980).

> A. *The record does not contain clear and convincing evidence that father failed to substantially remedy the conditions imposed on him under Code § 16.1-283(C)(2).*

Here, we would have found the record insufficient to demonstrate that by clear and convincing evidence, father failed to "remedy substantially" the conditions assigned to him by the Department. Our conclusion is drawn from the plain text and constitutional backdrop of Code § 16.1-283(C)(2), this Court's prior precedent, and the clear and convincing burden of proof. We begin with the burden of proof.

"Clear and convincing evidence is such proof as will establish in the trier of fact a firm belief or conviction concerning the allegations that must be established." *Thompson v. Bacon*, 245 Va. 107, 111 (1993). "This standard is considerably higher than a 'mere preponderance,' and has been fairly characterized as a 'heavy burden.'" *In re Brown*, 295 Va. 202, 227 (2018) (first quoting *Jud. Inquiry & Rev. Comm'n of Va. v. Pomrenke*, 294 Va. 401, 409 (2017); and then quoting *Commonwealth v. Allen*, 269 Va. 262, 275 (2005)). Hence, "the persuasive quality of clear-and-convincing evidence must establish that 'the thing to be proved is highly probable or reasonably certain.'" *Id.* (quoting *Clear-and-convincing evidence*, *Black's Law Dictionary* (10th ed. 2014)). Further, "[t]he clear and convincing standard 'cannot be met with evidence that leaves "competing inferences 'equally probable.'"'" *Madison v. Commonwealth*, 71 Va. App. 678, 692 (2020) (quoting *In re Brown*, 295 Va. at 227). "'More likely than not' proof falls short of that standard, as does, all the more, a mere evidentiary equipoise." *Id.* (quoting *In re Brown*, 295 Va. at 228). And this rigor is required as "[t]he termination of parental rights is a grave, drastic, and irreversible action." *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20-21 (1986).

Turning to the text of Code § 16.1-283(C)(2), we note that the pertinent language in question here is whether father's conduct "remed[ied] substantially the conditions which led to or required continuation of the child's foster care placement." Contextually, where conditions are concerned, "remedy" means "something that corrects or counteracts an evil: corrective, counteractive, reparation." *Remedy*, *Webster's Third New International Dictionary* (1961).[20] "'Substantially,' in the sense relevant here (i.e., when used to describe degree rather than solidity) means 'considerable' or 'to a large degree.'" *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196-97 (2002) (quoting *Substantially*, *Webster's Third New International Dictionary* (1976)); *see, e.g.*, *Sutton v. United Air Lines*, 527 U.S. 471, 491 (1999 (noting that where "[t]he ADA does not define 'substantially limits,'" context suggests "substantially" means "considerable" or "specified to a large degree"), *superseded on other grounds by statute*. Hence, "[s]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to *make reasonable changes*." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (emphasis added) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)). And this requirement makes sense, as the purpose of Code § 16.1-283 is to "rehabilitate" parents who have been found to lack parental skills or are struggling to provide an adequate environment to raise their children by giving them support and guidance to improve their ability in that regard. *See, e.g.*, *Lowe v. Dep't of Pub. Welfare of Richmond*, 231 Va. 277, 280 (1986) (affirming the

---

[20] "In interpreting [a] statute, 'courts apply the plain meaning . . . unless the terms are ambiguous or applying the plain language would lead to an absurd result.'" *Harris*, 82 Va. App. at 191 (alterations in original) (quoting *Miller & Rhoads Bldg., L.L.C. v. City of Richmond*, 292 Va. 537, 541 (2016)). In analyzing dictionary definitions, we note that this Court's focus in doing so is on making a "choice among meanings" in the statutory provision in question, Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 Harv. J. L. & Pub. Pol'y 61, 67 (1994), by comparing definitions of the same term, not "declar[ing] a unitary meaning" to the terms in question that apply to the term in every context, Note, *Looking It Up: Dictionaries and Statutory Interpretation*, 107 Harv. L. Rev. 1437, 1445 (1994).

termination of parental rights where "[t]he record discloses that the Department undertook to *rehabilitate* the mother" (emphasis added)); *Deahl v. Winchester Dep't of Soc. Servs.*, 224 Va. 664, 673 (1983) (finding sufficient evidence to support terminating a parent's parental rights where, in part, "[t]he Department clearly offered 'reasonable and appropriate' *rehabilitative* services which the [appellants] consistently rejected" (emphasis added)).

Here, we do not contest that the Department offered the father services which could only be undertaken remotely in Honduras. However, we do question the Department's determination that he failed to adequately engage with those remote services since the record reflects that he consistently engaged in the remote services (admittedly sometimes in a manner the Department felt was premature). We also question the efficacy of the Department's plan for remedying any identified parental deficiency based upon the uniquely difficult method by which these services were remotely provided and the fact that the father was a Honduran citizen living in far different conditions than those present in Alexandria, Virginia. Moreover, we would have found the circuit court's decision premature based on the record which reflects that the child had been parentally kidnapped from his home in a foreign land before coming into the Department's custody and his father had finally been able to legally arrive in Alexandria on the eve of the termination hearing. As a result of all the above, we would have found the evidence supporting the circuit court's conclusion that he was unwilling or unable to substantially remedy his aggressive parental behavior insufficient by clear and convincing evidence. Our conclusion is also based, in part, upon a similar case decided by our Court. *See Thach*, 63 Va. App. at 171.

First, as relevant here, this Court has previously reversed a circuit court's decision to terminate the parental rights of a deported "parent who[] . . . had nothing to do with the neglect that caused [the child's] placement in foster care" and who "did not even live with [the child] at the time he was removed from his mother's custody" under Code § 16.1-283(C)(2). *Id.* In

*Thach*, the child had been placed in foster care because his mother had been documented caring for him "under the influence of substances" and "leaving him with inadequate caregivers." *Id.* at 162. In that case, father was not in Virginia "as he had been deported to Mexico" and mother refused to give DHS "any contact information for [him]." *Id.* After the child had been returned to mother's custody, father returned to Virginia and "had hired an immigration attorney and was applying for a work permit." *Id.* at 164. Father was then "referred . . . to parenting education classes and home-based services" by the Department. *Id.*

Father, however, failed to complete his "recommended parenting classes."[21] *Id.* He also failed to complete other assigned "home based services" on time. *Id.* at 167, 172. A "psychological evaluation ordered by the J&DR court" also documented that father had a "lack of insight into [mother's] mental health and substance abuse needs." *Id.* at 165. During that psychological evaluation, father specifically "stated that he did not think [mother] had a substance abuse problem and that he felt comfortable with her caring for the children." *Id.* Evidence was also adduced showing that father was behind on his rent and utility bills, he had been working for cash as a drywall installer, and he was not on the family's lease due to his immigration status. *Id.* at 165-67. But the record otherwise "[wa]s devoid of any indication that [father] . . . in any way abused or neglected [his children], or ever used any drugs himself." *Id.* at 166. After considering the record, the circuit court terminated father's parental rights, reasoning that he came to the "table very, very late" in intervening to help his children and that if he had been involved "earlier the 'county would have addressed things a little differently' because there were 'home based services that weren't taken advantage of,' which could have helped [father] with 'hands-on care for [the child] and build him up.'" *Id.* at 167. The circuit court also found

---

[21] Due to father's delayed entrance into the country, the J&DR court "push[ed] back the termination hearing deadline to allow [father] more time to comply with the previous plan and ordered DHS to file a new plan 'if father is making progress.'" *Thach*, 63 Va. App. at 172.

that father "was unavailable to provide a stable home for [the child] and could not 'wait another six months or 60 days to figure it out,'" further finding that the child had "'a stable home right now [in foster care]' and is 'not only being well cared for, he is thriving' in foster care, and the 'the evidence would not support that if [the circuit court] returned him to . . . dad's care.'" *Id.* at 168 (third and fourth alterations in original).

We reversed this judgment on appeal. *See id.* at 174. We reasoned that since that Mexican father had reentered the country, he had made progress on his permanent status, "was the sole provider for [his other] infant son" who was documented to be "sufficiently cared for," and the Department had no further "concerns about [his] ability to care" for his children beyond these conditions that this termination was premature. *Id.* at 172-74. We noted that "[t]he fundamental liberty interest of natural parents in the care, custody and management of their children does not evaporate simply because they have not been model parents or have lost temporary custody . . . to the State." *Id.* at 173 (second alteration in original) (quoting *Crawley v. Richmond Dep't of Soc. Servs.*, 47 Va. App. 572, 581 (2006)). Thus, "[i]f there is 'reason to believe that positive, nurturing parent-child relationships exist, the [state's] *parens patriae* interest favors preservation, not severance, of natural familial bonds." *Id.* (second alteration in original) (quoting *Crawley*, 47 Va. App. at 581). Though the circuit court there had specifically found that termination was in the child's best interest, we found that "[w]hile circuit court judges are vested with considerable deference in determining a child's best interest, '[i]t is clear that the Constitution requires more than a mere showing of the child's best interest to terminate parental rights.'" *Id.* at 172-73 (second alteration in original) (quoting *Copeland v. Todd*, 282 Va. 183, 199 (2011)). It was true that there was evidence to show father had been less than compliant with the services he had been assigned. *See id.* at 165-67. But this did not show that "all other reasonable remedies have been attempted and failed" such that the Department could show by

clear and convincing evidence that termination of father's rights was "the only reasonable and appropriate recourse." *Id.* at 167. And "[w]hile it [wa]s certainly possible that a different situation may obtain in the future that might require revisiting" there was insufficient evidence at that time to "irreversibly sever" father's parental rights at that time. *Id.* at 173-74. Thus, under *Thach*, a parent's unavailability to care for their child due to a *deportation* is not a sufficient ground alone to terminate a parent's residual rights where there is evidence that the deported parent attempted to engage with services.

Also, in an unpublished case decided prior to *Thach*, this Court discussed the unique peculiarity related to termination of parental rights proceedings where undocumented immigrants are concerned. *See Fairfax Cnty. Dep't of Fam. Servs. v. Ibrahim*, No. 0821-00-4, slip op. at 6-10, 2000 Va. App. LEXIS 824, at \*8-12 (Dec. 19, 2000).[22] In *Ibrahim*, the circuit court terminated a father's parental rights after he was "arrested for importing drugs into the United States" upon returning from a trip to his "native country, Ghana." *Id.* at 2, 2000 Va. App. LEXIS 824, at \*2-3. The facts before this Court in *Ibrahim* reflected that the children had been removed and placed in foster care due to father's "deportation" and "[t]wenty months after the removal and placement in foster care" had passed while father remained out of the country. *Id.* at 3, 2000 Va. App. LEXIS 824, at \*4. As a result, the Department "contend[ed] that rendering little or no service to the father amounted to rendering reasonable services because it could not offer services during his incarceration in a federal prison" and that "[a]fter deportation, it had no way to provide services in Ghana." *Id.* at 3-4, 2000 Va. App. LEXIS 824, at \*4-5. The Fairfax County Department further highlighted that father "[did] not contact[] [it] during the two months following [his] deportation" though the Department "did consider returning the children to the

---

[22] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012); *see also* Rule 5A:1(f).

father if he remained in the United States but never acted on that possibility." *Id.* at 3-4, 2000 Va. App. LEXIS 824, at *3-4. The Fairfax County Circuit Court, in that case, further noted that the children came into its custody because they were left with a family friend who "physically abused them" when father was deported. *Id.* at 2, 2000 Va. App. LEXIS 824, at *3. The Fairfax court declined to terminate father's parental rights. *See id.* at 4-5, 2000 Va. App. LEXIS 824, at *6. This Court found that the Department failed to provide that Ghanaian father reasonable services as it never evaluated him, assisted in his transition from incarceration, or investigated the possibility of coordinating efforts with an agency in Africa to provide him services. *See id.* at 8, 2000 Va. App. LEXIS 824, at *9-10. It also found the period of two months after deportation an unreasonably short period in which father was to establish contact with that Department due to the attendant circumstances. *See id.* at 8, 2000 Va. App. LEXIS 824, at *10. The court further found that the conditions that brought the children into foster care had been substantially corrected because the family friend was no longer their caretaker and the father was no longer incarcerated, though he was living in Ghana. *See id.* at 5, 2000 Va. App. LEXIS 824, at *6. At bottom, the circuit court in *Ibrahim* found that the Fairfax Department's basis for terminating father's parental rights stemmed from his deportation, and it refused to give this argument credence. *See id.* at 5, 2000 Va. App. LEXIS 824, at *6-7.

On appeal, we affirmed the Fairfax Circuit Court's decision. *Id.* at 9-10, 2000 Va. App. LEXIS 824, at *11. In doing so, we agreed that the Department in that case failed to "establish a prima facie case under Code § 16.1-283(C)(2) because . . . father never failed to do what the [D]epartment or the court required of him." *Id.* at 8, 2000 Va. App. LEXIS 824, at *10. The Department had not offered him services due to his being in Ghana, and as a result he had not failed to engage with such services. *See id.* at 8-9, 2000 Va. App. LEXIS 824, at *10. Though "[t]he [D]epartment contend[ed] the home and the services that the father could provide in

Ghana justify severing the relationship between the children and . . . father" this Court found that this argument would have required the circuit court "to speculate about the children's future because the [D]epartment offered no information about the situation in Ghana and made no efforts to determine the conditions there." *Id.* at 9, 2000 Va. App. LEXIS 824, at *11. As a result, "[w]hile it may well be best for the children to remain in the United States," the Department's petition was insufficient to justify termination at that time because "the decision [to terminate parental rights] must be based on fact not supposition." *Id.*

Here, the situation is even more unique, peculiar, and extreme than what was before this Court in *Thach* and *Ibrahim*. This child, a Honduran citizen, was parentally kidnapped by his Honduran mother, who illegally brought him to Virginia without the consent of his Honduran father. His Honduran father then filed a report alleging parental kidnapping with DINAF but was not made aware of his child's whereabouts until his wife had been institutionalized and his kidnapped child had been placed in foster care. His mentally ill wife and her friend alleged to the Department that father had previously engaged in domestic violence solely against his wife (neither woman alleged that the father had been abusive to the child). Even though the allegation that the father had previously abused his wife occurred, that allegation by itself, cannot serve to establish by clear and convincing evidence either that the father abused his child or that he failed to remedy any prior aggressive behavior following his son being placed in foster care. The same is true with regard to C.G.'s allegations that his father had abused him prior to mother kidnapping his younger brother. Neither can the statements of his Honduran relatives and in-laws asserting that his child would be better off staying in the United States. Hence, all of the evidence before the circuit court concerning aggressive behavior was *historical* and focused on what father had done prior to his child being placed in foster care. Moreover, the record before this Court on appeal fails to adduce sufficient evidence of any aggressive behavior on the part of

- 33 -

this Honduran father toward his son following his son's entry into foster care. In addition, there is substantial evidence in the record that the father participated remotely in each of the classes offered to him by the Department designed to remedy his prior aggression. The evidence also reflects that immediately after being able to obtain a visa, the father made the over 2000 mile journey to Alexandria legally and attended the termination hearing where he offered to apply for asylum solely to be involved in his son's life. Based on this record, the Department's petition appears to be nothing more than a post hoc rationalization for its decision to cease working with the father in spite of him finally making it to the United States legally so that he could participate directly and in person in further remedying any remaining parental deficiencies. Thus, there remains insufficient evidence in the record to establish by clear and convincing evidence that father was either unwilling or unable to remedy the conditions requiring his child to remain in foster care. As a result, the evidence the Department relied on had little bearing on whether father actually remedied his assigned conditions.[23] In any event, the circuit court decision completely ignores the fact that father had filed a report that the child had been parentally kidnapped by mother or that the abuse and neglect of the child by his mother was the cause for the child's placement in the Department's custody since father could not care for his kidnapped child living in the United States while he was living in Honduras. Accordingly, like the Court in *Thach*, we would have found that the evidence here showed that father did not cause the child to

---

[23] Almost none of the information the Department relied on in its termination petition was known to it during its initial decision that services were warranted before returning the child to his father, as that decision hinged solely from mother's friend's statement. Hence, the Department's decision to withhold the child from father's custody and to place him in foster care seems primarily caused by father's status as a Honduran citizen living in Honduras, since nothing father had done had caused the Department to refrain from returning the child to his custody beyond that hearsay statement. And the Department's imposition of the requirements for the child's return should be similarly bounded by that fact as well.

enter foster care beyond not being present in the United States, as the child had been parentally kidnapped from his custody in Honduras. 63 Va. App. at 171.

As it related to his remedying the conditions placed upon him as required by the text of Code § 16.1-283(C)(2), the record further reflects that by the date of the termination hearing, father had made efforts to "correct[] or counteract[]" the conditions placed upon him by the Department. *Remedy*, *Webster's Third New International Dictionary*, *supra*. With regard to father's inability to legally enter the United States, father was finally able to obtain a visa and legally attend the termination hearing following the relaxation of the issuance of visas to immigrants from Honduras as the COVID-19 pandemic restrictions subsided. Father even testified during the termination hearing that he would seek asylum to maintain his parental relationship with his child even though he preferred to continue to live in Honduras with his son. With respect to remedying his alleged lack of parental skills, the record reflects that he "consistently" attended his visitation calls with his son and participated virtually in family partnership meetings and several treatment team meetings. Thus, father demonstrated through his consistent participation in the mandated process that he was both willing and able to do whatever needed to be done to have his child returned to him.

We acknowledge that father did not always behave in the exact manner desired by the Department during the mandated meetings, in part, by frequently telling his child that he would be reunited with him. In addition, father reasonably explained any absences from mandated sessions on scheduling conflicts with his work schedule that arose based upon travel conditions in Honduras as well as both the technological and logistical challenges faced in Honduras that made his remote participation difficult. Under this unique and peculiar factual scenario, the Department was in essence directing changes to a foreign citizen's conduct who otherwise had never been present in its jurisdiction beyond having his child found there following his

- 35 -

kidnapping. Thus, we submit that this father gave his best effort in attempting to comply with the Department and no evidence exists in this record establishing by clear and convincing evidence that this father was unwilling or unable to comply. Based on prior precedent, father should not have been required to show that he had once and for all remedied all of these conditions based, in part, on how the child came into the Department's custody. *See, e.g.*, *Thach*, 63 Va. App. at 164 (noting that father's failure to complete assigned training was not fatal to his parental rights). Instead, the father was only required to make "considerable" changes or those "to a large degree" consistent with the assigned conditions. *Toyota Motor Mfg.*, 534 U.S. at 196-97 (quoting *Substantially*, *Webster's Third New International Dictionary*, *supra*). And we would have found that the record reflects that he did just that.

Although the record contains evidence of father's prior aggressive conduct toward mother and that he occasionally used corporal punishment to discipline their children, this evidence of his prior aggression can serve only as an ex-ante justification for *requiring* father to undertake services. His prior aggression cannot serve as dispositive evidence that he has failed to engage in the mandated process as the Department portrayed during the ore tenus hearing. At most, the testimony presented by the Department during the hearing simply showed that this Honduran father needed education and assistance to become a better father, not that he was unable or unwilling to remedy any prior aggressive parental behavior. This Court said as much in *Ibrahim*, finding that evidence of a deportation and a *criminal drug smuggling* offense were insufficient alone to obviate the Department of its duty to assist a parent in improving their parenting skills. No. 0821-00-4, slip op. at 9-10, 2000 Va. App. LEXIS 824, at *11. The mere fact, as alleged here by the Department, that father failed to alter his communications with his son, post-parental kidnapping, can hardly satisfy the heavy burden of showing by clear and convincing evidence that the parenting classes had not improved father's identified parenting

deficiencies. Upon such thin evidence, a factfinder could not be sure what type of impact the parenting classes had upon father, and thus there could be no "firm belief or conviction" that father had not remedied his identified parenting deficiencies. *Pomrenke*, 294 Va. at 409. It could also be inferred from the record concerning father's missed hearings (virtually) before the JDR court that the complications posed by his foreign residence led to any failure to successfully adapt to the training provided by the Department. As the COVID-19 pandemic was also at the forefront of concerns at the time, the technological issues faced by father in Honduras could not be easily assessed by the Department when compared to any technology issues faced by a resident of Alexandria, Virginia. But, as this Court has plainly provided before, the fact that father lives abroad cannot relieve the Department of its clear and convincing evidentiary burden. *Ibrahim*, slip op. at 6-10, 2000 Va. App. LEXIS 824, at *8-12. Quite simply, there has been "no demonstrated failure of [father] to make reasonable changes" *after* receiving his training. *Yafi*, 69 Va. App. at 552. As a result, we are compelled to find that the circuit court's decision to terminate father's parental rights was premature.

> B. *Based upon the majority's reasoning, a foreign parent of a parentally kidnapped child could have their parental rights terminated without an ability to remedy based on the limited resources they may have access to as measured against the American foster care alternative.*

Finally, we warn that the facts here, including that the child was taken from father involuntarily through parental kidnapping from another country, compels this Court to treat this case sui generis. At a minimum, the reported parental kidnapping of the child from Honduras alone should compel this Court to be extremely cautious when deciding whether to affirm the termination of father's parental rights. In Virginia, the General Assembly has "explicitly codified" a parent's "fundamental right to make decisions concerning the upbringing, education, and care of the parent's child." *Williams v. Panter*, 83 Va. App. 520, 533 (2025) (quoting Code § 1-240.1). Hence, "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the *parents*, whose

primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (plurality opinion). Our caselaw has never imposed a specific minimal requirement on parents regarding how to undertake those decisions and to provide that care, instead evaluating each case on the particular facts and circumstances involved. Here, the Department, by identifying issues with the adequacy of father's Honduran home, as well as the general living conditions within Honduras, and other conditions specific to life in a remote village in Honduras, seemingly applies the living conditions in a foster care home in Alexandria as its standard for comparison. If we were to adopt the view that all parents throughout the world were required to provide the same level of opportunities, education, and care that can be provided by a resident of Alexandria, Virginia, then most of the world would fail to meet that standard. This would be true even though children residing in another country are well cared for and happy with the conditions in which they live with their family. That type of standard seems beyond the pale, impossible to meet, and would invariably result in the ill-advised termination of the parental rights of many.

Paternalism, although well meaning, can only go so far. We must be careful not to permit well-meaning Departments to prescribe requirements and standards entirely divorced from the means, capabilities, and customs of the parents of children residing in other countries, especially as in this case where the child is present here solely as a result of parental kidnapping. Otherwise, we risk imposing a standard that may be prudent in Alexandria, Virginia, but not when applied to the world writ large.

Thus, our inquiry must be focused on the parent's treatment of his child and his ability to improve the circumstances that they live in *considering where they come from.* To do otherwise would permit the termination of the rights of otherwise capable parents all due to the *reference point* from which the child enters the legal proceeding. For all intents and purposes, to do so would

obliterate the constitutional right Virginians have enshrined regarding parents and their children for the sake of adopting a type of rank paternalism that supposes that a certain subset of parental behaviors are the only ones acceptable for purposes of maintaining the parental relationship. *See supra* footnote 17; *see also* Code § 1-240.1 (providing that "[a] parent has a fundamental right to make decisions concerning the upbringing, education, and care of the parent's child"). Therefore, we are compelled to caution this Court concerning the dangers of rubber-stamping decisions by local departments that shift our caselaw toward this type of paternalistic reasoning.

In sum, we would have found the Department's decision to terminate father's parental rights to be essentially founded in his behavior before the mother parentally kidnapped their son, a post hoc rationalization to support placing the child in foster care. Since father had finally, legally arrived in the United States, we would have found it entirely premature to deem that he failed to remedy his assigned conditions and would have extended to him the opportunity to do so in person. Certainly, if he had failed to demonstrate improvement within a reasonable time, the circuit court would have possessed all the evidence necessary to confirm that termination was appropriate by clear and convincing evidence. As a result, we would have reversed the circuit court's judgment and for the aforementioned reasons, we respectfully dissent.

Causey, J., with whom Athey, Chaney, and Bernhard, JJ., join, dissenting.

It is undisputed that father and son were separated by a cross-continental parental kidnapping,[24] executed by the child's mother, who then abused or neglected the child, as defined by Code § 16.1-228. After the child was placed in foster care, the conditions that initially led to the child entering foster care were eliminated. The mother, who suffered from severe mental illness, voluntarily surrendered her rights to the child. She no longer resided in the home where the reported domestic violence had occurred. At that point, DCHS was statutorily required to provide services to rehabilitate and improve the ability of Guevara-Martinez, the child's father, to meet the child's needs. Code §§ 16.1-281; -283(C)(2).

At the subsequent termination of parental rights proceeding, the court was required to evaluate Guevara-Martinez's current abilities and circumstances, in line with the purpose of the statutorily required and court-ordered services of rehabilitation and reunification. Specifically, the statute required that the court evaluate whether DCHS had proven by "clear and convincing evidence" (1) that DCHS had provided "reasonable and appropriate" rehabilitative services and (2) that Guevara-Martinez, *himself*, "without good cause, [had] been *unwilling or unable . . . to remedy substantially* the conditions which led to or required continuation of the child's foster care placement." Code § 16.1-283(C)(2) (emphasis added).

At the hearing, DCHS presented no evidence that Guevara-Martinez was unwilling or unable to substantially remedy any conditions that had led to or required continuation of the placement within a reasonable timeframe. The evidence, therefore, was legally insufficient to substantiate the *specific* finding required by Code § 16.1-283(C)(2) in this case. We further note

---

[24] The majority states that we err in referring to this incident as a parental kidnapping. Nothing in the record contradicts Guevara-Martinez's statement that his child was taken to a foreign country without his knowledge or permission. *Cf. Boyd v. Commonwealth*, 72 Va. App. 274, 279 (2020) (affirming "parental abduction" conviction despite father's argument that he was justified due to mother having hit the child).

that a termination of parental rights in the absence of evidence that the Virginia Code's prerequisites for such termination have been met has constitutional implications. It is a bare minimum requirement of the U.S. Constitution that the Virginia Code limit the termination of parental rights to cases in which parental unfitness has been shown by clear and convincing evidence. *Wright v. Alexandria Div. of Soc. Servs.*, 16 Va. App. 821, 829 (1993). *See Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982) ("Before a State may sever completely and irrevocably the rights of parents in their natural child, due process *requires* that the State support its allegations by *at least* clear and convincing evidence." (emphases added)).

As the majority states, the circuit court "gave considerable weight to the DINAF home study report and testimony presented at the hearing." Notably, both the home study and C.G.'s witness testimony were about events that happened in Honduras, prior to the child coming into the care of DCHS, and at least three years prior to the termination hearing. The child, who was eight years old at the time of trial, was no older than five at the time of these events. Significantly, neither the report, nor the testimony nor any other evidence indicated that the conditions described in the DINAF home study or witness testimony existed at the time of the trial or during the statutorily designated timeframe. Placing significant weight on a home study about historical events—the Department's initial basis for keeping the child in foster care—was error. DCHS presented no evidence of the father's current home conditions, or any evidence suggesting any aggression or domestic violence exhibited by Guevara-Martinez in the past three years. DCHS presented no evidence that Guevara-Martinez was unwilling or unable to substantially remedy any past aggression or domestic violence.

While we agree that a circuit court generally has broad discretion to make decisions in a child's best interests, trial courts still cannot terminate parental rights without sufficient evidence of the factual prerequisites of the parental rights termination statute. In this case, based on the

- 41 -

evidence before the trial court, no reasonable factfinder could have found the elements required by Code 16.1-283(C)(2) by clear and convincing evidence. That finding was, thus, plainly wrong.[25]

The determinative questions in this case are whether DCHS provided legally sufficient evidence to substantiate findings by clear and convincing evidence that (1) Guevara-Martinez failed to make reasonable[26] changes and (2) that Guevara-Martinez was unwilling or unable to remedy the problems *during the period* in which father was offered rehabilitative services. The answer to both questions is no. All the evidence provided is consistent with father being willing and able to make reasonable changes during the period in which services were offered.

Although the en banc majority considers any constitutional argument waived, the constitutional imperative of strictly enforcing Virginia's termination of parental rights statute is not an independent argument for reversal that is subject to waiver. Instead, we emphasize this constitutional imperative to underscore the importance of reversal in a case in which the Virginia

_____

[25] The en banc majority suggests that by focusing on DCHS's heavy burden of proof in this case, we "misconstrue our role on review." But our standard of review requires careful attention to the evidentiary standards that the factfinder has been required to apply in each case. As an appellate court, we do not ask whether findings are plainly wrong in a vacuum. Instead, our "plainly wrong" assessment requires us to ask whether any reasonable factfinder could have reached the challenged findings under the applicable burden of proof. *See Glass v. Commonwealth*, 74 Va. App. 214, 219 (2022) (For purposes of reviewing criminal appeals, "[a] trial court's decision is not *plainly wrong* unless no rational trier of fact 'could have found the essential elements of the crime *beyond a reasonable doubt*.'" (emphases added) (quoting *Spratley v. Commonwealth*, 298 Va. 187, 193 (2019))); *Clark v. Commonwealth*, 78 Va. App. 726, 752 (2023) (In a criminal case, "[w]hether an alternate hypothesis of innocence is *reasonable* is a question of fact and, therefore, is binding on [this Court] unless *plainly wrong*." (second alteration in original) (emphasis added) (quoting *Maust v. Commonwealth*, 77 Va. App. 687, 700 (2023)). If the majority means to suggest that our assessment requires no particular emphasis on the factfinder's burden of proof, then it is the majority opinion that misconstrues our appellate role.

[26] "'[R]easonable' means 'fair; just; ordinary or usual; not immoderate or excessive; not capricious or arbitrary.' It means what is 'just, fair and suitable under the circumstances.'" *Sydnor Pump & Well Co. v. Taylor*, 201 Va. 311, 317-18 (1959) (citations omitted).

Code's requirements have not been met. By terminating Guevara-Martinez's parental rights in the absence of evidence to support a finding under the statutorily designated criteria, the trial court in this case failed to enforce the U.S. Constitution's baseline requirements. We respectfully dissent.

      I. The Constitution requires strict compliance with Virginia's termination of parental rights statute.

"[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). The liberty "interest of parents in the care, custody, and control of their children – is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." *Id.* at 65. This liberty is "essential to the orderly pursuit of happiness by free men." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 38 (1981) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). The rights of a parent to conceive and raise his own children are among the "basic civil rights of man." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (quoting *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942)).

The Due Process Clause strictly limits the ability of a state to interfere with or abrogate a parent's fundamental liberty, even when the state believes that state action is in the best interests of a child. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925) ("The child is not the mere creature of the State."). For example, even upon proof that grandparent visitation is in a child's best interests, no court may grant them visitation rights without at least giving some "special weight" to a "fit" parent's wishes to the contrary. *Troxel*, 530 U.S. at 70. *See also Williams v. Panter*, 83 Va. App. 520, 540 (2025) (holding Virginia statute unconstitutional as applied to permit grandparents a streamlined path to visitation rights pursuant to a showing that their deceased child had consented to visitation).

The termination of parental rights is the most extreme form of interference with parents' constitutionally protected liberties. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759. When a parent's rights are terminated, he or she is irrevocably designated a "legal stranger" to his or her child. *Lowe v. Richmond Dep't of Pub. Welfare*, 231 Va. 277, 280 (1986) (quoting *Shank v. Dep't of Soc. Servs.*, 217 Va. 506, 509 (1976)). All rights of parenthood, including the right to visitation, are permanently extinguished. Code § 16.1-228. These consequences far exceed those of any other family law remedy. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 121 (1996) (contrasting a parent's loss of custody with this "irretrievably destructive" procedure). All in all, the termination of a parent's rights is one of the most severe and consequential orders that a judge can issue in any case, civil or criminal. *See Santosky*, 455 U.S. at 759 ("Few forms of state action are both so severe and so irreversible."); *M.L.B.*, 519 U.S. at 119 ("[F]ew consequences of judicial action are so grave[.]"); *Lassiter*, 452 U.S. at 27 (Termination "work[s] a unique kind of deprivation."). *See also Drury v. Lang*, 776 P.2d 843, 845 (Nev. 1989) ("[T]ermination of a parent's rights to her child is tantamount to imposition of a civil death penalty[.]").

The Due Process Clause, therefore, places significant restraints on a state's ability to terminate parental rights. There is "little doubt" that courts are constitutionally required to determine that a parent is "unfit" before permanently separating him from his children. *Quilloin v. Walcott*, 434 U.S. 246, 255 (1977) (quoting *Smith v. Org. of Foster Families*, 431 U.S. 816, 862-63 (1977) (Stewart, J., concurring in judgment)). *See also Stanley*, 405 U.S. at 652 ("[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents."); *Santosky*, 455 U.S. at 767 n.17 ("Any *parens patriae* interest in terminating the natural parents' rights arises only at the dispositional stage, *after* the parents have been found

- 44 -

unfit."). Further, no parent's rights may be terminated unless the allegations against the parent are supported by "at least clear and convincing evidence." *Santosky*, 455 U.S. at 748. *See also Wright*, 16 Va. App. at 829 ("Before a state may sever completely and irrevocably the rights of a parent in his or her natural child, due process requires that the state support its allegations of parental unfitness by at least clear and convincing evidence.").

Virginia permits the termination of parental rights only upon proof of certain facts "tantamount to a finding of parental unfitness." *Knox v. Lynchburg Div. of Soc. Servs.*, 223 Va. 213, 220 (1982). Virginia's termination scheme is only constitutional because it requires proof of unfitness by clear and convincing evidence. *Wright*, 16 Va. App. at 829-30. It is therefore of paramount and constitutional importance that Virginia courts limit termination decisions to the strict requirements of the Code. When a Virginia court terminates parental rights in the absence of clear and convincing evidence that the statutory requirements have been met, it fails to uphold the bare minimum required by the U.S. Constitution.

> II. The evidence was insufficient to support a termination under the statute, which sets forth baseline constitutional requirements.

The evidence in this case was legally insufficient to support the finding required to be proven by clear and convincing evidence under Code § 16.1-283(C)(2): that Guevara-Martinez, having received reasonable assistance, was unwilling or unable, without good cause, to substantially remedy conditions that led to or required the continuation of his child's foster care placement. The trial court was plainly wrong in reaching such a finding in the case at bar, as they could not have done so by clear and convincing evidence.

The facts which must be proven under Code § 16.1-283(C)(2) are highly specific. Code § 16.1-283(C)(2) is not a catch-all termination provision. It is not an invitation for agencies, in cases in which one parent has subjected a child to abuse or neglect, to conduct a generalized parenting skills assessment of the *other* parent—akin to an assessment of one among many

- 45 -

possible "placements." Instead, "[t]he termination of parental rights pursuant to Code § 16.1-283(C)(2) amounts to a *last resort* to protect children when *all other reasonable remedies* have been attempted and failed[.]" *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 174 (2014) (emphases added).

As the majority notes, the child was placed in foster care in this case due to the actions of the child's mother. The conditions attributable to Guevara-Martinez that could have arguably "required continuation of the child's foster care placement" were his alleged past acts of domestic violence against the child's mother, corporal punishment of the child's brother with a belt and a rope, and punishment of the child by requiring him to kneel for ten minutes. All of these alleged acts, accepted as true for the purposes of appeal, occurred at least *three years* prior to the circuit court's termination proceeding, prior to the child's departure from Honduras, and prior to the child's placement in foster care. They occurred in a household that no longer existed at the time of the termination hearing, as the mother and C.G. had left Honduras.[27]

The Department argued that these prior acts were evidence of "aggression and domestic violence" that required the continuation of the child's foster care placement.[28] A Code § 16.1-283(C)(2) termination on the basis of these conditions required not only that these several-years-old past acts have required the continuation of the child's foster care placement, but also that the Department prove by clear and convincing evidence that Guevara-Martinez, within 12 months of foster care placement, without good cause, and despite having received

_____

[27] Of note, the record contains no indication of whether the punishment of C.G. happened before or after the child at issue in this case had even been born.

[28] The majority states that Guevara-Martinez was required to remedy an "abusive environment." Neither party to this case used this phrase. DCHS argued that Guevara-Martinez failed to remedy their "concerns about Mr. Guevara's aggression and history of domestic violence."

reasonable assistance,[29] was unwilling or unable to substantially remedy those several-years-old conditions.

The record in this case contains no evidence that Guevara-Martinez was unwilling or unable to remedy any aggression or domestic violence exhibited at least three years prior. Faced with the burden to prove such a failure to remedy conditions by clear and convincing evidence, DCHS provided no evidence of any aggression or domestic violence by Guevara-Martinez in the 12-month statutory period. Code § 16.1-283(C)(2). There was no evidence of aggression or domestic violence reported by any of the multiple service providers in this case. DCHS also provided no evidence that Guevara-Martinez failed to engage with the services of DCHS, DINAF, the Multicultural Clinical Center, CASA (Court Appointed Special Advocates), the parenting coach, the guardian ad litem, or any of the other numerous agencies and personnel that contacted him. In fact, their own evidence revealed that Guevara-Martinez consistently engaged with DCHS's services and that, according to their most updated documentary evidence, the quality of the parent-child relationship had improved over time.

Viewed in the light most favorable to DCHS, the evidence emphasized by DCHS amounts to a list of small, arguable inconsistencies in Guevara-Martinez's participation with the various agencies as he interacted with them from 2,000 miles away. But it is legally insufficient under the statute—and we emphasize, the Constitution—for a parent's communication with an agency to have been imperfect, or for an agency's personnel to wish that a parent had interacted with them differently. Minor imperfections in a parent's relationship with the agency are either wholly irrelevant to or, if relevant at all, legally insufficient to prove the highly specific facts that the legislature selected as a proxy for parental unfitness under Code § 16.1-283(C)(2). Under

_____

[29] DCHS does not argue that any of the conditions identified in Code § 16.1-281, relieving DCHS from its normal obligation to attempt to reunite a parent and his child, were present in this case.

- 47 -

that provision, the burden on DCHS was to provide *clear and convincing proof* of an *inability or unwillingness* to *substantially remedy conditions*.  Code § 16.1-283(C)(2).  In this case, all the evidence was that these original conditions, which occurred in a household that was no longer in existence, no longer existed.  A reasonable factfinder could not have concluded that DCHS met their burden by showing by clear and convincing proof that the conditions of aggression and domestic violence were still present in the home in this case.

The arguments pressed by the Alexandria DCHS in this case do not meet the strictures of Code § 16.1-283(C)(2).  These arguments can be assessed in turn.  (1) Guevara-Martinez's participation in virtual rather than in-person parenting classes provides no indication that he was unwilling or unable to remedy past aggression or domestic violence.  First, the lack of reliable transportation to complete a weekly 100-mile round trip constitutes "good cause" to the extent to which good cause for taking virtual classes could be necessary.  Second, even if a factfinder were to disregard the transportation issue and focus on Guevara-Martinez's reported statement that the trip would have been "too much effort," the fact that Guevara-Martinez requested virtual classes has no relevance to the question of his willingness or ability to remedy past aggression and domestic violence: there was no evidence that the virtual parenting classes that Guevara-Martinez took were insufficient.  There is no legal presumption against virtual parenting classes. The record shows that Guevara-Martinez requested and took virtual parenting classes, and this positive fact cannot support the termination of his parental rights.

(2) Inconsistencies in Guevara-Martinez's internet connection and phone service and the presence of farm animal sounds in the background of calls do not indicate unwillingness or inability to correct past aggression or domestic violence.  (3) Inconsistencies in Guevara-Martinez's July 2020 and August 2020 virtual calls and treatment team meetings are legally insufficient to show that Guevara-Martinez was unwilling or unable to substantially remedy past

- 48 -

aggression or domestic violence.  Viewing the evidence in the light most favorable to DCHS, and ignoring Guevara-Martinez's explanation that some calls conflicted with his work schedule, we cannot disregard that these would still be the only reported unexcused absences by Guevara-Martinez in any of the seven long-form CASA reports and DCHS foster care plans describing Guevara-Martinez's virtual engagement with DCHS and his child over the course of two years. Rare inconsistencies cannot reasonably be interpreted as clear and convincing evidence of inability or unwillingness.

(4) The fact that Guevara-Martinez often (a) allowed his child to take the lead during calls and (b) assured his child that they would be reunited in Honduras does not indicate unwillingness or inability to correct past aggression or domestic violence.  First, no evidence exists to support a conclusion that Guevara-Martinez's deference to his child was detrimental. Second, it is hard to understand how Guevara-Martinez's statements about Honduras, even if not ideal, could be viewed as anything other than the natural reaction of a father who missed his son.[30]  Together, these minor deviations from DCHS's preferred mode of communication cannot reasonably be interpreted to suggest, much less prove by clear and convincing evidence, that Guevara-Martinez was unwilling or unable to substantially remedy conditions.

(5) The fact that the child sometimes did not want to participate in calls with Guevara-Martinez does not indicate that Guevara-Martinez was unwilling or unable to remedy past aggression or domestic violence.  It is unsurprising that a child subject to the turmoil of this case would have mixed feelings, and this fact cannot deprive Guevara-Martinez of his rights.  *Cf. Newport News Dep't of Soc. Servs. v. Cooper*, No. 1230-04-1, slip op. at 3, 2004 Va. App.

---

[30] It is particularly important, in reviewing evidence of a Honduran parent's virtual interactions with his child, that this Court consider the specifics of these interactions rather than relying on DCHS's reported opinions that these parent-child interactions were "inappropriate." *Cf. White v. Commonwealth*, 46 Va. App. 123, 132 (2005) (lay witnesses cannot provide opinions).

LEXIS 499, at*4 (Oct. 26, 2004) (TPR petition appropriately denied because of a lack of evidence that father had failed to remedy conditions in a case in which DCHS presented evidence of an "expressed desire of the children not to return to their father's care."). Additionally, the record clearly demonstrates the improvement of the parent-child relationship over time. The second-newest CASA report in the record, dated October 2021, reports that the foster parent described Guevara-Martinez as "very patient" with his son, and noted that while "the visits with Mr. Guevara have not gone as well earlier this year," they "have improved recently." The newest CASA report in the record states that in December 2021, Guevara-Martinez's assigned parent coach reported that the virtual calls "were going better than they had in November 2021" and that "their best visits were when his father shared memories of Honduras with [the child]." The same report states that in January 2022, the parent coach reported that "visits with [Guevara-Martinez] continued to go well." The report concluded, "Reportedly, the video visits with his grandparents in Honduras go *very well*, as do the visits with [an aunt and uncle], in-person visits [the child] has with his mother, *and virtual visits with his father*." (Emphases added). It is not possible to read the record to indicate anything other than a positive trend over time. Ignoring this fact would require not merely viewing the evidence in the light most favorable to DCHS, but distorting the record.

(6) Guevara-Martinez's inability to obtain a visa to come to the United States until immediately before the circuit court's termination hearing does not indicate that he was unable or unwilling to correct past aggression or domestic violence. First, there is no requirement that parents travel to the U.S. or Virginia to prove improvement of past aggression or domestic violence. Why should Guevara-Martinez have been required to obtain a visa to chase after his child? Such a requirement would not only be arbitrary but would invert the burden of proof— Guevara-Martinez was not required to affirmatively prove his remediation of conditions; *DCHS*

was affirmatively required to prove an unwillingness or inability to remedy conditions by clear and convincing evidence. *See Thach*, 63 Va. App. at 174 ("Code § 16.1-283(C)(2) . . . requires that DHS establish by clear and convincing evidence that termination of a parent's rights is the *only* reasonable and appropriate recourse—it *does not require a parent to prove* by clear and convincing evidence that he should retain his fundamental liberty interest in the custody of his child." (emphases added)).

To the extent that Guevara-Martinez could have been required to obtain a visa, the unrebutted evidence demonstrates that Guevara-Martinez had "good cause" for being unable to do so prior to the expiration of the 12-month period designated by Code § 16.1-283(C)(2). As a DCHS foster care worker acknowledged[31] to the trial court, the COVID-19 pandemic prevented Guevara-Martinez from obtaining a visa to travel to the U.S. following his child's February 2020 placement in foster care. It was not until late September 2020 that DCHS informed Guevara-

---

[31] Guevara-Martinez's attorney and the foster care worker engaged in the following colloquy at trial:

> [Y]ou would agree that Mr. Guevara told your agency that he was unable to come to the United States, right?
> Correct, he had reported ongoing efforts to attempt to come here.
> And it's more than just buying a plane ticked for Mr. Guevara, it was that he didn't have a visa, correct?
> Correct.
> He didn't have a passport, correct?
> Correct.
> And at this time the planet is under a global pandemic, is that right?
> Correct.
> That has caused massive disruptions to agencies public and private, right?
> Correct.
> Did you think that Mr. Guevara was lying to you that he couldn't get a visa?
> No.
> So you believe him?
> Yes.

- 51 -

Martinez that he was expected to take parenting classes in response to the allegations in the home study report. The 12-month time limit is not a straitjacket, and it is reversible error to disregard efforts made after the expiration of the 12-month period where good cause for delay exists. *L.G. v. Amherst Cnty. Dep't of Soc. Servs.*, 41 Va. App. 51, 56-57 (2003). Further, there is no basis to expect Guevara-Martinez to have obtained a visa between July 2019 and February 2020, before his child was placed in foster care, rather than reporting his child as abducted to DINAF (as the trial court explicitly found Guevara-Martinez did), and repeatedly requesting that DCHS return his child home, as the undisputed evidence showed that he did.[32]

The en banc majority's analysis relies on one further point. They argue that because Guevara-Martinez disputed the allegations against him in court and with DCHS, he cannot have remedied the conditions in this case. This position conflates two separate questions: the presence of a condition requiring the continuation of foster care and the remediation of that condition. If anything, the fact that Guevara-Martinez has consistently denied that he committed the alleged past aggression or domestic violence acts makes it especially laudable that he nonetheless cooperated with DCHS's requirements. Most crucially, only DCHS bore a burden of proof in this proceeding. Guevara-Martinez was not and cannot have been required to prove *anything* to secure his child's return, including by making an in-court admission. *See Thach*, 63 Va. App. at 174 (Code § 16.1-283(C)(2) places no burden of proof on the parent.).

In sum, there was no evidence before the trial court that would indicate that Guevara-Martinez, at present, had failed to remedy any past tendency towards aggression or domestic

---

[32] The attorney for DCHS engaged in the following colloquy with Guevara-Martinez:

> So for about half of 2019 you knew [the child] was in the United States?
> Well, yes.
> But you didn't apply for a visa that year, correct?
> No, because I was appealing for the return of my child.

violence. Even disregarding the fact that the victim of the domestic violence was the mother, not the child and that she no longer resided with Guevara-Martinez, as well as the fact that "Virginia, like every other state, permits parents to discipline their children with corporal punishment," *Woodson v. Commonwealth*, 74 Va. App. 685, 689 (2022), there was no evidence that such past conditions had continued. DCHS provided no evidence of any aggression or domestic violence by Guevara-Martinez at any point during the 12-month statutory period or thereafter. The findings in the home study and the allegations by C.G., relied on heavily by the trial judge in her findings of fact, related only to the past conditions that DCHS had the burden of proving had not been remedied.

Viewed in the light most favorable to DCHS, the department also provided no evidence of substantial noncompliance with any of their or other agencies' services. Besides attaining perfection in his interactions with the agency—which is not required—it is unclear what else DCHS could have required Guevara-Martinez to do. Most crucially, remediation of conditions was not for Guevara-Martinez to prove. DCHS, and not Guevara-Martinez, bore the burden of proving an inability or unwillingness to substantially remedy conditions in this case. Finally, there was no showing by DCHS that termination was used as a "last resort" in this case after "all other reasonable remedies [had] been attempted and failed." *Thach*, 63 Va. App. at 174. We agree with Judge Bernhard that the termination occurred at the best possible moment to stop the momentum towards a TPR, and assess whether Guevara-Martinez had remedied conditions: after Guevara-Martinez had arrived in the U.S.

A termination in these circumstances was not permitted under the statute and was not permitted under the Constitution. We will not belabor the point, but we agree with Judge Athey that a termination of a Honduran-citizen-parent's parental rights to his Honduran-citizen child on the basis of minor perceived flaws in that parent's engagement with Alexandria DCHS indicates

the dangers of cultural bias playing a role in TPR decisions, a risk that has been noted by the

United States Supreme Court. *See Santosky*, 455 U.S. at 762-63 (In proceedings for the

termination of parental rights, "numerous factors combine to magnify the risk of erroneous

factfinding. . . . Because parents subject to termination proceedings are often poor, uneducated,

or members of minority groups, such proceedings are often vulnerable to judgments based on

cultural or class bias.").[33]

Fundamentally, the question in this case was not whether Guevara-Martinez was a

"model parent." *Id.* at 753. The question was whether DCHS's evidence was legally sufficient

to meet its significant, constitutionally mandated burden of proof before it could permanently

sever the natural bonds of a family. Under the specific requirements of Code § 16.1-283(C)(2),

the evidence provided was insufficient in this case. Therefore, the trial court's termination

decision should have been reversed.

---

[33] Of note, the median household income in Alexandria, Virginia is $110,294, *2023 Am. Community Survey 1-Year Estimates* (https://data.census.gov/table/ACSST1Y2023.S1901?g=050XX00US51510). According to 2018 data, roughly half of the Honduran population lives on less than $5.50 per day. World Bank Group, *Poverty & Equity Brief*, April 2020 (https://databankfiles.worldbank.org/public/ddpext_download/poverty/33EF03BB-9722-4AE2-ABC7-AA2972D68AFE/Global_POVEQ_HND.pdf).

Bernhard, J., with whom Athey, Causey, and Chaney, JJ., join, dissenting.

We respectfully dissent and further submit that this case did not merit the Court's exercise of its discretion to grant en banc review.

*I. The panel opinion did not warrant revisiting.*

This case involves a deeply unfortunate situation. A child was brought to the United States by his mother, without the knowledge or consent of his father. Mother's parental rights were subsequently terminated due to mental illness. Father may have committed domestic violence against mother years earlier. He lived abroad and, due to distance, the COVID-19 pandemic, and limited access to communication technology, lacked a meaningful opportunity to demonstrate his current fitness as a parent.[34] Notably, the primary impediment to his doing so—his inability to reside in the United States—was removed shortly before trial in the circuit court when he gained legal status to live in this country. Despite this development, there is no evidence that, once father was in the United States, any services were offered to support his rehabilitation. Offering such services, along with a brief postponement of the termination of parental rights proceedings, would not have caused any cognizable prejudice, and might have protected his fundamental parental rights.

Given that termination of parental rights is the civil equivalent of the death penalty in family law, courts must ensure a meaningful, not merely perfunctory, opportunity to establish fitness before permanently severing the parent-child relationship.[35] The termination decision

---

[34] Father moved for a continuance prior to the initial termination hearing in the City of Alexandria Juvenile and Domestic Relations District Court, seeking time to enter the United States lawfully and appear in person. The court denied the motion, and father, represented by counsel, participated by phone. The court thereafter terminated his parental rights. On appeal to the circuit court, father appeared in person, having arrived in the United States just recently.

[35] "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is[] . . . a commanding one." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981).

here was, in these circumstances, prematurely final and legally harsh. The three-judge panel's opinion and concurrence, reversing and remanding to allow father a limited opportunity to establish parental capacity, was hardly the kind of judgment that warranted en banc intervention.

II. *Established principles and relevant considerations weighed against discretionary en banc review in this case.*[36]

Rehearing en banc is a remedy best applied when matched by a compelling necessity. It is most ordinarily and reasonably invoked to address the following[37]:

1. *Significant Error Correction* – to remedy errors of heightened importance, particularly when the panel's decision has resulted in material and irreversible prejudice to a party.

2. *Issues of Public Importance* – when guidance from the full Court will directly impact substantial societal, governmental, or individual interests.

3. *Precedential Consistency* – to uphold the doctrine of stare decisis and ensure uniformity in the Court's jurisprudence.

---

[36] Whether to rehear a case en banc is, by statute, committed to the discretion of the Court. Under longstanding tradition, the votes of individual judges on whether to grant en banc review are not disclosed. Furthermore, the fact that a judge joins the en banc majority opinion does not necessarily indicate that judge also voted to rehear the case en banc. When, as here, a dissent is filed, en banc review may be ordered with the affirmative votes of as few as six of the Court's seventeen regular judges. *See* Code § 17.1-402(D). By contrast, in a federal circuit court of appeals, en banc review may be granted only by a majority of the judges in regular active service. In addition, rehearing en banc is "not favored" unless "necessary to secure or maintain uniformity of the court's decisions," the panel decision conflicts with other precedent, or the question involved is of "exceptional importance." *See* Fed. R. App. P. 40.

[37] This Court has conducted en banc proceedings in cases involving these considerations. *See, e.g.*, *Martin v. Commonwealth*, 13 Va. App. 524 (1992) (en banc) (significant error correction); *Humphries v. Buchanan*, 80 Va. App. 774 (2024) (en banc) (issue of public importance); *Jennings v. Commonwealth*, 82 Va. App. 692 (2024) (en banc) (precedential consistency and conflict reconciliation); *Fairfax Cnty. Sch. Bd. v. Rose*, 29 Va. App. 32 (1999) (en banc) (matter of first impression); *Diggs v. Commonwealth*, 6 Va. App. 300 (1988) (en banc) (statutory ambiguity); *Lee v. Lee*, 12 Va. App. 512 (1991) (en banc) (recurring issue). This list is illustrative rather than exhaustive and is not arranged in any particular order of priority.

4. *Conflict Reconciliation* – to address conflicting decisions that erode doctrinal coherence in the application of the law.

5. *Matters of First Impression* – to resolve substantial and novel legal questions likely to shape future judicial decisions.

6. *Statutory Ambiguity* – to clarify ambiguous legislative language through authoritative construction, ensuring consistent application by courts, litigants, and public officials.

7. *Recurring Issues* – to address recurring legal questions that have evaded binding review, thereby preventing fragmented or inconsistent legal development.

Arguably, none of these considerations, or any comparably salient basis for en banc intervention, were present in this case.

Further, en banc review, by its very nature, predominantly culminates in a published opinion carrying the weight of binding precedent. The customary criteria for publication are well settled: the opinion should establish, modify, or clarify a rule of law; shed light on a previously overlooked principle; or address an issue of significant public importance. None of these discrete principles supporting en banc review were implicated here, as implicitly acknowledged by the unpublished status of the en banc majority opinion.

Regardless of whether the panel decision is published or not, en banc review should be reserved for compelling cases, of which this is not one. At its core, this was a fact-driven appeal, and the three-judge panel's opinion and concurrence, narrowly tailored to remand for limited factual development, did not merit full-Court scrutiny. The only discernible basis for en banc review appears to be arguably legitimate differences in perspective on a nonbinding panel decision—a slender reed on which to anchor such a consequential procedural step. Judicial restraint counsels that "courts should think hard, and then think hard again, before turning small

cases into large ones." *See Rebh v. Cnty. Bd. of Arlington Cnty.*, 303 Va. 379, 383 (2024) (order) (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)).

III. *The expansive resort to en banc review applied here may raise institutional concerns if it becomes the norm.*

Panel decisions form the foundation of the Court's steady and principled administration of appellate justice. En banc review has its rightful place in addressing matters of heightened importance; however, should its overuse become prevalent, this may engender diminished trust in panel decisions and risk undermining public confidence in the finality and authority of the Court's ordinary appellate process.

Dissent is an expected and valuable feature of appellate adjudication. It reflects the rigor of judicial deliberation. But it should not, by itself, serve as an automatic catalyst for full-Court rehearing. En banc review is not simply a second appeal of the three-judge panel's decision, but a full rehearing on the same assignments of error. *See* Code § 17.1-402(D), (E); *Turner v. Commonwealth*, 56 Va. App. 391, 434 (2010) ("[T]his Court, sitting en banc, has . . . the duty to decide the issues presented in this case as if the panel proceedings had never occurred." (italics omitted)). If panel decisions are too readily displaced, the Court risks diminishing its institutional standing.

Rehearing en banc is labor-intensive: it disrupts court calendars, necessitates additional briefing and coordination, and delays the resolution of other cases. If relied upon too heavily, it may undermine judicial efficiency and strain limited resources. Such overuse could also fracture the Court's voice,[38] diluting the distinct purpose of full-bench review as a means for principled

---

[38] En banc hearings can produce splintered opinions, drawing criticism that the resulting decisions lack the authoritative weight of a majority holding. *See, e.g.*, *Watts v. Commonwealth*, 82 Va. App. 428 (2024) (en banc) (six judges joined the lead opinion, five concurred in the judgment, and five dissented). Judge Learned Hand once observed, with characteristic irony, that en banc decisions can paradoxically carry less authority than the panel rulings they replace:

correction.  By contrast, disciplined restraint promotes stability, predictability, and a more deliberate evolution of the Court's jurisprudence.

## CONCLUSION

En banc review is a valuable corrective mechanism, but one that should be employed sparingly and judiciously.  The three-judge panel's fact-bound decision did not warrant rehearing en banc, particularly because it reflected a reasonable and measured application of the law, rather than a significant legal error that prematurely resulted in a final judgment or departed from established precedent.  That should have ended the matter.

Accordingly, we respectfully dissent.  We would reverse the judgment terminating father's parental rights and remand the case to the trial court to afford him a limited opportunity to demonstrate his fitness to resume custody of his child.

---

"I cannot but admire [the Chief Judge's] device of having all the judges of a Circuit sit together; it so much increases the certainty of the result.  For example, [in one Third Circuit case] your vote is four to three, when it might have been only two to one."  Randy J. Kozel, *Going En Banc*, 77 Fla. L. Rev. 233, 261 (2025) (alterations in original) (quoting Gerald Gunther, *Learned Hand*: *The Man and the Judge* 442 (2011)).

## _VIRGINIA:_

_In the Court of Appeals of Virginia on_ **Wednesday** _the_ **6th** _day of_ **November, 2024**.

Jorge Guevara-Martinez, Appellant,

against          Record No. 1848-22-4
                 Circuit Court Nos. CJ22001017 and CJ22001018

Alexandria Department of Community and Human Services, Appellee.

Upon a Petition for Rehearing En Banc

Before Chief Judge Decker, Judges Beales, Huff, AtLee, Malveaux, Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael, Lorish, Callins, White and Frucci

On October 15, 2024, the appellee, by counsel, filed a petition requesting that the Court set aside the judgment rendered on October 1, 2024, and grant a rehearing en banc on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the Court grants the petition for rehearing en banc and reinstates the appeal of those issues on the docket. The Court stays the mandate previously entered in this case pending the Court's en banc decision.

The parties must file briefs in compliance with the schedule set forth in Rule 5A:35(b).

A Copy,

Teste:

A. John Vollino, Clerk

By:  _original order signed by a deputy clerk of the_
     _Court of Appeals of Virginia at the direction_
     _of the Court_

Deputy Clerk

Present:   Judges Athey, Causey and Callins
Argued at Winchester, Virginia

**UNPUBLISHED**

JORGE GUEVARA-MARTINEZ

                                        MEMORANDUM OPINION[*] BY
v.        Record No. 1848-22-4        JUDGE DORIS HENDERSON CAUSEY
                                              OCTOBER 1, 2024

ALEXANDRIA DEPARTMENT OF
 COMMUNITY AND HUMAN SERVICES

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
Lisa B. Kemler, Judge

James C. Martin (Martin & Martin Law Firm, on briefs), for
appellant.

Helen T. Clemens (Joanna C. Anderson; Meghan S. Roberts; Office
of the City Attorney, on brief), for appellee.

No brief or argument from the guardian ad litem for the minor
child.[1]

Jorge Guevara-Martinez (father) appeals the circuit court's orders, entered on November 14,

2022, terminating his parental rights to his son and approving the foster care goal of adoption.

Father argues that the circuit court erred by terminating his parental rights and approving a foster

care goal of adoption "where the child had been illegally abducted from another country, thus

depriving the court of legitimate subject matter jurisdiction."  Father further contends that the circuit

court violated his due process rights when the City of Alexandria Department of Community and

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] On June 8, 2023, and June 27, 2023, the Clerk's office notified Luis Chinchilla, the minor child's guardian ad litem, that the Court had not received a brief or letter stating which party he supported.  *See* Rule 5A:19(d).  Although the Court requested a response within 14 days, the guardian ad litem never responded to the Court's correspondence.

Human Services (the Department) failed to present clear and convincing evidence that he was an "unfit" parent. Father also asserts that "delays caused by the abduction, the pandemic, [his] refusal to enter the United States illegally, and the appeals in this case . . . cannot be used to conclude that the child's need for finality requires termination" of his parental rights. Finally, father argues that the circuit court erred by terminating his parental rights and approving the foster care goal of adoption "where the Interstate Compact for the Placement of Children is being circumvented by efforts to divert placement to an illegal alien."

BACKGROUND[2]

Father and Martiza Ulloa Turcios (mother) are the biological parents to the child who is the subject of this appeal.[3] The family lived together in Honduras until July 2019, when mother and the then-five-year-old child left father because of what mother described as "constant physical and psychological abuse." Mother and child eventually came to the United States.[4] In October 2019, the Department received reports alleging abuse and neglect by mother and concerns about her mental health. While father told the Department that mother took the child without his permission, mother told the Department that she came to the United States because father had been physically, verbally, and emotionally abusive towards her. Despite the decline of mother's mental health, she

---

[2] "On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *C. Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)). The record in this case was sealed. "[T]his appeal requires unsealing certain portions to resolve the issues raised by the parties." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022). We unseal only the facts mentioned in this opinion; the rest of the record remains sealed. *Id.*

[3] On October 28, 2021, mother signed a permanent entrustment agreement, which the City of Alexandria Juvenile and Domestic Relations District Court approved.

[4] Mother met a man online, moved to Virginia (U. S.), married him, and began living with him and his three children in the City of Alexandria from July 2019 to September 2019. Mother was asked to leave the home by her husband for "displaying verbal abuse, yelling, and name calling."

refused services and told the Department that she did not need a mental health assessment. The Department and mother entered into a safety plan in which mother was not to be left alone with the child; one of mother's friends agreed to be the child's caretaker.[5] When mother's mental health continued to decline, the Department sought a protective order for the child.

On October 30, 2019, the City of Alexandria Juvenile and Domestic Relations District Court (the JDR court) entered a child protective order and temporary order awarding mother's friend sole legal and physical custody of the child. The JDR court subsequently adjudicated that the child was abused or neglected, finding that he was "without parental care . . . caused by the unreasonable absence or the mental or physical incapacity of the child's parent." Later, the JDR court entered a dispositional order. The JDR court's records reflect that father was not present at the initial JDR court hearings, though he was represented by court-appointed counsel.

In February 2020, mother's friend told the Department that she needed to travel to El Salvador to care for an ill relative; the friend signed a temporary entrustment agreement, and the child entered foster care. Two months later, mother's friend returned to the United States and indicated that she could no longer care for the child. The Department petitioned for emergency removal, which the JDR court granted. The Department had determined that father was not a placement option at that time because of mother's allegations that father had been abusive towards her. Thus, the child remained in foster care, and the JDR court again adjudicated that the child was abused or neglected.

After the child entered foster care, the Department established requirements that father[6] had to complete before he could be reunited with the child. The Department asked father to

---

[5] Mother's friend was a neighbor who obtained legal residency in January 2020. The record is void of mother's husband being considered as a placement option.

[6] Father is Spanish-speaking.

- 3 -

participate in family partnership meetings and monthly treatment team meetings. The Department also required father to maintain contact with the child and participate in parent coaching services. In addition, father had to cooperate with a home study.

Although father did not travel from Honduras to the United States because of the COVID-19 pandemic and his lack of a passport or a visa, he participated virtually in family partnership meetings and several treatment team meetings and indicated that he wanted the child returned to his care. Father's participation in meetings did involve "some inconsistencies." Sometimes, father "listen[ed] in and ask[ed] questions," but at other times, he did "not show up," had "challenges with his [internet] connection," or was not in "a quiet environment."

Shortly after the child entered foster care, the Department attempted to "complete a home study with International Social Services," but due to the COVID-19 pandemic, Honduras was under a "complete lock-down and home studies [were] not being completed until restrictions [were] lifted." Several months later, on August 6, 2020, the Directorate for Children, Youth, and Family (DINAF) completed a home study for father in Honduras. DINAF interviewed several of father's relatives, including his parents and older children. All recommended that the child remain in the United States and not return to father in Honduras. Accordingly, DINAF did not recommend placing the child with father because his family described him as "an irresponsible and aggressive person who engaged in domestic violence against" mother.

The Department referred father to parent coaching and parent support services in a "rural city" approximately 45 minutes away (one-way) from his home, but father stated that he would not participate in the services due to the distance and unreliable bus transportation. The Department then arranged for father to participate virtually in parent coaching through the Multicultural Clinical Center, which also supervised his virtual visits. Father "consistently" participated in phone and video calls with the child, although the Department was concerned that the conversations caused the

child "distress" because father "often" discussed the child's return to Honduras. The Department found that father required "assistance with appropriately engaging with [the child] and maintaining a positive relationship with him."

While the Department offered some services to father, it also explored other relative placement options. A paternal uncle and aunt in Texas expressed interest in serving as the child's caregivers. The Department arranged for the child to have weekly contact with these relatives, along with one of his older brothers who had been living with the relatives. The Department also arranged for the child to visit these relatives in Texas. In addition, the child's relatives travelled to Virginia at least twice to visit him. The Department sought a home study of the paternal uncle and aunt's home through the Interstate Compact on the Placement of Children (ICPC). Texas Social Services found that the child's relatives would not be approved as "a relative foster home" because the paternal uncle was not a legal resident or United States citizen. The Department could not place the child with the Texas relatives without ICPC approval. Thus, the Department sought to change the goal of foster care to adoption.

The Department did not recommend placing the child with father because of his "history of aggression and domestic violence" and failure to address the Department's concerns. In October 2021, the Department petitioned to terminate father's parental rights and recommended a foster care goal of adoption/relative placement. Father asked for a continuance so that he could appear in person at the hearing; however, his motion was denied. Father participated in the JDR court termination hearing by telephone while represented by counsel. The JDR court terminated father's parental rights and approved the foster care goal of adoption. Father appealed the JDR court's rulings.

On November 14, 2022, the parties appeared before the circuit court; surprisingly, father was present in person, having received a visa a few days before the hearing. The Department

presented evidence that the child, who was eight years old and healthy, was "responding really well in his foster home." Initially, the child only spoke Spanish, but as of the circuit court hearing, he spoke English "fluently" and was "doing really well in school." Since entering foster care, the child's mental health had improved, and he was "actively engaging in therapy to address the traumas that he had endured."

Father and his family wanted the child with family. Acknowledging that father had repeatedly stated that he wanted the child returned to him, the Department remained concerned about father caring for the child because of the "ongoing reports of his abusive history" and father's lack of understanding of the child's needs. For example, during visits, father needed "constant" reminders to ask the child questions, engage with him, and have "child-appropriate conversations" with him.

The Department also presented evidence from C.G., one of father's older sons. Before moving to the United States, C.G. had lived with father, mother, the child, and his other brother in Honduras. While they lived together, C.G. "[f]requently" witnessed father physically and verbally abusing mother. According to C.G., father hit mother and insulted her, sometimes in front of the child. After the child reported to the paternal grandparents that father had hit mother, father made the child, who was two years old at the time, kneel for "about ten minutes."[7] C.G. also testified that father hit him with a belt and with a rope, which father denied.

After the Department rested, father moved to strike; the circuit court denied father's motion. Father testified that mother and C.G. left Honduras in 2017 and moved to Mexico. He denied abusing mother and said that they had an "excellent" relationship before she "abandoned the home." Father, the child, and another of father's sons remained in Honduras. Seven months after she left, mother returned to Honduras and stayed until the summer of 2019, when she "took

---

[7] Father denied hitting mother and punishing the child.

- 6 -

the child" out of school without telling father. Two days later, father reported the incident to DINAF. According to father, he did not know where the child was until mother's friend contacted him months later to request that he "sign something" so that she could "have the child"; father refused. When the Department contacted father, he stated that he had filed "a report with immigration to have [the child] returned to Honduras" and asked the Department to return the child to him. Father testified that the last time he saw the child was "[a]bout three years ago."

Father described himself as an "[e]xemplary father" to the child. Father testified that he and the child played ball together and bathed in the river. They went to the store and a local restaurant together. When father "had time," he took the child to school and picked him up. Father also took the child to medical appointments and the hospital because sometimes the child got a fever and "just collapse[d]." Father reiterated that he wanted to take the child home to Honduras, but if he could not do so, he was willing to "seek political asylum in this country." Most notably, father was the child's primary caretaker just prior to the child being taken from Honduras to the United States.[8]

After hearing all the evidence and arguments, the circuit court found that the evidence was sufficient to terminate father's parental rights under Code § 16.1-283(C)(2) and approve the foster care goal of adoption and relative placement. The circuit court acknowledged father's efforts to file a complaint with DINAF for the return of the child and his efforts to come to the United States for the termination hearing. The circuit court also recognized father's efforts to engage in fun activities with the child, take him to medical appointments, and provide for the family financially. Yet the circuit court found it "equally compelling" that "not one person," including his parents and his older children, thought that father was "fit to care" for the child. The circuit court credited C.G.'s

---

[8] Mother lived in Mexico for seven months. Father remained in the home with their two sons. Upon mother's return, she lived in father's parents' house until 2019 when she took the child to the United States.

testimony describing father's "physical violence" and "completely inappropriate" punishment of the child. The circuit court also found that father waited until "the last possible moment to actually make [a] serious effort to come [to Virginia] to address the situation in person" and questioned whether he was just "going through the motions." The circuit court held that it was in the child's best interests to terminate father's parental rights. Father appeals.

ANALYSIS

"On review of a trial court's decision regarding the termination of parental rights, we presume the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 699 (2022) (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

I. Jurisdiction

For the first time on appeal, father challenges the circuit court's jurisdiction. In his opening brief, father states that "this case is *apparently* covered by the Hague Convention on the Civil Aspects of International Child Abduction." (Emphasis added). He also contends that the circuit court "*seems* to have had no subject matter jurisdiction to terminate [his] parental rights." (Emphasis added). "Subject matter jurisdiction defines a court's 'power to adjudicate a case,'" *Hannah v. Commonwealth*, 303 Va. 106, 123 (2024), and to do so "upon the merits and dispose of it as justice may require," *Pure Presbyterian Church of Washington v. Grace of God Presbyterian Church*, 296 Va. 42, 49 (2018) (quoting *Shelton v. Sydnor*, 126 Va. 625, 629

(1920)). "[F]or a court to have the authority to adjudicate a particular case upon the merits," it must possess subject matter jurisdiction. *Id.*

"Whether the record establishes subject matter jurisdiction in a particular case is a question of law reviewed de novo on appeal." *Ruderman v. Pritchard*, 76 Va. App. 295, 302 (2022). "[T]he lack of subject matter jurisdiction can be raised at any time in the proceedings, even for the first time on appeal by the court *sua sponte*." *Holden v. Commonwealth*, 26 Va. App. 403, 407 (1998) (quoting *Morrison v. Bestler*, 239 Va. 166, 170 (1990)). "'Jurisdiction of the subject matter can only be acquired by virtue of the Constitution or of some statute,' and it 'refers to a court's power to adjudicate a class of cases or controversies.'" *Cilwa v. Commonwealth*, 298 Va. 259, 266 (2019) (first quoting *Pure Presbyterian Church*, 296 Va. at 56; and then quoting *In re Commonwealth*, 278 Va. 1, 11 (2009)). "The Constitution of Virginia vests courts with the 'judicial power' to adjudicate classes of cases and controversies determined by the General Assembly." *Id.* at 267 (quoting Va. Const. art. 6, § 1).

A circuit court has jurisdiction to consider the termination of a parent's parental rights under Code § 16.1-283. *See Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 327 (2013) ("Virginia JDR and circuit courts have subject matter jurisdiction to determine the custody, control, or disposition of a child within its jurisdiction alleged to be abused or neglected or where the termination of residual parental rights is sought."); *see also* Code §§ 16.1-241(A), -244.

Father's challenge to the circuit court's jurisdiction rests on his contention that the case may fall within the parameters of the Hague Convention. The United States is a contracting party of the Hague Convention, which "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Golan v. Saada*, 596 U.S. 666, 670 (2022) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)). "Congress implemented the Convention in the International Child Abduction Remedies Act (ICARA), 102 Stat. 437, as amended, 22 U.S.C. § 9001 *et seq*." *Id.* at

671. "Under ICARA, state and federal district courts have concurrent original jurisdiction of actions arising under the Convention." *Coe v. Coe*, 66 Va. App. 457, 473 (2016) (citing 22 U.S.C. § 9003(a)). "Any person seeking the return of a child pursuant to the Convention may commence a civil action by filing a petition in a court where the child is located." *Id.* (citing 22 U.S.C. § 9003(b)). The provisions of ICARA are not self-executing. "The petitioner bears the burden of showing by a preponderance of the evidence that the removal or retention was wrongful under [Hague Convention] Article 3; the respondent must show by clear and convincing evidence that one of Article 13's exceptions applies to prevent the return." *Id.* (citing 22 U.S.C. § 9003(e)(1)(A), (2)(A)); *see also Golan*, 596 U.S. at 671-72 (noting that father filed a petition under ICARA). Father has not filed a petition under ICARA seeking the return of the child, so the Convention is not implicated in this case.[9]

Father has not filed a petition seeking the return of the child, nor has he addressed his burden of proving that the child's "removal or retention was wrongful" under the Hague Convention.[10] *Coe*, 66 Va. App. at 473. Notwithstanding this, even if a petition were to be filed, our courts would have concurrent original jurisdiction of this controversy. *See id.* Thus, the circuit court would continue to have jurisdiction over this matter.[11] Therefore, father's argument is

---

[9] Moreover, even when the Convention is implicated, the circuit courts of this Commonwealth have subject matter jurisdiction to consider a properly filed petition. *See* 22 U.S.C. §§ 9002(8), 9003(a); *Coe*, 66 Va. App. at 473.

[10] In his reply brief, father contends that filing a petition was "discretionary," but he does not address his burden of proving by "a preponderance of the evidence that the removal or retention was wrongful under Article 3." *Coe*, 66 Va. App. at 473.

[11] ICARA provides that "any court exercising jurisdiction of an action brought under section 9003(b) of this title may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition." 22 U.S.C.A. § 9004(a). Thus, even if the Hague Convention were implicated as father asserts, and even if he filed a petition accordingly, the court's concurrent jurisdiction over that claim would not preclude it from exercising its jurisdiction under Virginia Code § 16.1-283. The termination of parental

- 10 -

unpersuasive, and we find that the circuit court had subject matter jurisdiction under Code

§ 16.1-283.

## II. Due Process and Termination of Parental Rights

Father argues that the circuit court violated his due process rights by terminating his parental

rights because there was not clear and convincing evidence that he was an "unfit" parent. He argues

that the evidence was insufficient to justify such a termination. We agree.

"The Fourteenth Amendment to the Constitution is not confined to the protection of citizens.

It says: 'Nor shall any State deprive any person of life, liberty, or property without due process of

law; nor deny to any person within its jurisdiction the equal protection of the laws.'" *Yick Wo v.*

*Hopkins*, 118 U.S. 356, 369 (1886). "These provisions are universal in their application, to all

persons within the territorial jurisdiction, without regard to any differences of race, of color, or of

nationality; and the equal protection of the laws is a pledge of the protection of equal laws." *Id.*

"The parent-child relationship 'is a constitutionally protected liberty interest under the Due Process

Clause of the Fourteenth Amendment.'" *Lively v. Smith*, 72 Va. App. 429, 441 (2020) (quoting *L.F.*

*v. Breit*, 285 Va. 163, 182 (2013)).

"It is undisputed that parents have a fundamental liberty interest in the companionship, care,

custody, and management of their children." *In re B*, 756 N.W.2d 234, 241 (Mich. Ct. App. 2008)

(citing *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982)). "[U]ntil the State proves parental

unfitness, the child and his parents share a vital interest in preventing erroneous termination of their

natural relationship." *Santosky*, 455 U.S. at 760. "This fundamental liberty interest pertains to

citizens and aliens alike because 'the Due Process Clause applies to all "persons" within the United

---

rights pursuant to Code § 16.1-283 is done in accordance with the "best interests of the child,"
and thus falls within the scope of 22 U.S.C.A. § 9004(a).

States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.'" *In re B*, 756 N.W.2d at 241 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

"The preservation of the family, and in particular the parent-child relationship, is an important goal for not only the parents but also government itself." *Weaver v. Roanoke Dep't of Human Res.*, 220 Va. 921, 926 (1980). "While it may be occasionally necessary to sever the legal relationship between parent and child, those circumstances are rare." *Id.* This Court has held that "[t]he termination of parental rights is a grave, drastic, and irreversible action. When a court orders termination of parental rights, the ties between the parent and child are severed forever and the parent becomes a 'legal stranger to the child.'" *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986) (quoting *Lowe v. Richmond Dep't of Pub. Welfare*, 231 Va. 277, 280 (1986)).

"Statutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship." *Weaver*, 220 Va. at 926. The circuit court terminated father's parental rights under Code § 16.1-283(C)(2), which authorizes a court to terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)).

"Code § 16.1-283 permits complete termination of parental rights only if 'clear and convincing evidence' demonstrates that parental unfitness cannot be remedied within a reasonable period of time." *Wright v. Alexandria Div. of Soc. Servs.*, 16 Va. App. 821, 829 (1993). "The term 'clear and convincing evidence' has been defined as 'that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *Judicial Inquiry & Review Comm'n of Va. v. Pomrenke*, 294 Va. 401, 409 (2017) (quoting *Judicial Inquiry & Review Comm'n of Va. v. Waymack*, 284 Va. 527, 534 (2012)). This standard is considerably higher than a "mere preponderance," *id.*, and has been fairly characterized as a "heavy burden." *Commonwealth v. Allen*, 269 Va. 262, 275 (2005); *United States v. Watson*, 793 F.3d 416, 420 (4th Cir. 2015). "Such a standard cannot be met with evidence that leaves 'competing inferences "equally probable."'" *In re Brown*, 295 Va. 202, 227 (2018) (quoting *Edmonds v. Edmonds*, 290 Va. 10, 22 (2015)).

Moreover, under Code § 16.1-283 "[t]he evidence must show that 'reasonable and appropriate efforts' were made by social agencies to remedy the conditions leading to foster care by less severe means of intervention and through rehabilitative services." *Wright*, 16 Va. App. at 829-30 (quoting *Weaver*, 220 Va. at 928). "Only after the failure of those efforts to remedy the conditions leading to foster care may the state sever the parental rights." *Id.* at 830.

Here, we hold that the circuit court prematurely terminated father's parental rights. The record before us contains no "demonstrated failure of [father] to make reasonable changes." *Yafi*, 69 Va. App. at 552 (quoting *Toms*, 46 Va. App. at 271). The Department established several requirements for father to complete before he could be reunited with his child. For example, father had to comply with a home study, which he did. Father also had to attend parent coaching services, which the Department then arranged for father to receive through the same agency that supervised his visits with the child. Although father could not travel to the United States because of the

- 13 -

COVID-19 pandemic and his lack of a visa or passport, he clearly indicated that he wanted his child returned to his care. He filed a complaint with DINAF once he learned that his son did not come home from his kindergarten class and he discovered that his son had been abducted.[12] Father participated virtually in family partnership meetings and several treatment team meetings required by the Department. Finally, the Department also required father to maintain contact with the child. Father consistently participated in phone and video calls with the child, although the Department was concerned that the conversations caused the child "distress" because father "often" discussed the child's return to Honduras.

The Department put on evidence that it provided father in-person parenting classes, which he either refused or was unable to avail himself of, then made a virtual parenting class available to father. The Department presented no evidence nor made any allegations that he failed to participate in this virtual class. The Department presented evidence that father failed to adjust his communication style with the child during virtual visits to one they deemed more appropriate. The social worker testified that father received instruction about how to communicate with the child during their virtual visitation, but father by and large did not respond to this instruction. Though the Department presented evidence of an initial home study that recommended not placing the child with father, there was no testimony of any follow-up evaluation after father had participated in the virtual parenting class. Father testified about his desire to be in his child's life and that he had taken several steps to remedy the Department's concerns.

---

[12] Father testified that he went to work as normal, and the child went to his kindergarten class. Mother took the child out of his kindergarten class, which father discovered when he returned home from work and mother and child were gone. Subsequently, father reached out to DINAF to file a complaint.

Even in the face of a global pandemic, the record demonstrates that father complied with the demands of the Department. Father has continuously contended that mother took their child without his permission and that he desires to be reunited with his son. Moreover, father did nothing to cause the child to be in the custody of the Department. Father participated in the JDR court termination hearing by telephone after the JDR court denied his motion for continuance so that he could appear in person. Father participated in the virtual parenting classes and complied with the home study. Father even traveled to the circuit court termination hearing five days early. However, no evidence shows that once father was in Virginia, services were offered to attempt to rehabilitate father. Thus, once he was in the United States, father was not afforded a meaningful opportunity to remedy the Department's concerns and rehabilitate himself.

The child was placed in foster care after a decline in mother's mental health. The child was initially placed with mother's friend, who could no longer care for the child. The Department determined that father was not a placement option at that time because of mother's allegations that father had been abusive toward *her*, not the child. The Department put on evidence from father's son, C.G., who testified that he "[f]requently" witnessed father physically and verbally abusing mother and that father made the child, who was two years old at the time, kneel for "about ten minutes."[13] This testimony at most established that father had been abusive towards the child's mother and had physically disciplined, perhaps excessively, his children. This evidence went to the initial need for the child to be in foster care. It established the conditions that the Department had determined needed improving before father became a suitable placement for the child. By its nature therefor, it did not have any bearing on whether father had remedied these conditions. Based on the record, father no longer has a relationship with mother. Mother's parental rights have been terminated. Thus, the "conditions leading to foster care" have arguably been

---

[13] Father denied hitting mother and punishing the child.

- 15 -

remedied. There is no mention of other additional conditions that father must remedy nor is there any support in the record that father was responsible for the incidents that led to the child being placed in foster care. Furthermore, to the extent that any other conditions have not been remedied, the Department has failed to take "reasonable and appropriate efforts" to help father remedy them.

Thus, the only evidence before the circuit court that father had not remedied the situation requiring the child's continued foster care placement was the Department's opinion that father had not sufficiently modified how he participated in virtual visits with the child. This is not clear and convincing evidence that the father failed to remedy the situation requiring the child's continuation in foster care. Though the circuit court's finding "is entitled to great weight," here, it is "without evidence to support it." *Simms*, 74 Va. App. at 470 (quoting *Ridgeway*, 59 Va. App. at 190). The mere fact that father did not modify his communications with his son can hardly satisfy the heavy burden of showing by more than a mere preponderance that the parenting classes had not improved father's identified parenting deficiencies. Upon such thin evidence a fact finder could not be sure what type of impact the parenting classes had upon father, and thus there could be no "firm belief or conviction" that father had not remedied his identified parenting deficiencies. *Pomrenke*, 294 Va. at 409. Quite simply, there has been no "demonstrated failure of [father] to make reasonable changes." *Yafi*, 69 Va. App. at 552 (quoting *Toms*, 46 Va. App. at 271).

Considering the totality of the record, "reasonable and appropriate efforts" were not made by the Department to remedy the conditions that led to the child being placed in foster care. Furthermore, the Department has failed to provide clear and convincing evidence that demonstrates that father's unfitness cannot be remedied within a reasonable period of time.

Thus, the circuit court prematurely terminated father's parental rights under Code § 16.1-283(C)(2) and erred in approving the foster care goal of adoption.[14]

## CONCLUSION

Children who enter this country and are reported abducted must be afforded the opportunity to reunite with their parents and families once found. Here, the parent-child relationship is a constitutionally protected right that extends beyond citizenship. Thus, the circuit court erred by violating father's fundamental right to parenthood when the court terminated his parental rights. Accordingly, the circuit court's judgment terminating father's parental rights and approving the foster care goal of adoption is reversed and remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

[14] Because "[w]e have an 'obligation to decide cases on the best and narrowest grounds available,'" we conclude that this holding under Code § 16.1-283(C)(2) is the best and narrowest ground for the resolution of this appeal. *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023) (quoting *Esposito v. Va. State Police*, 74 Va. App. 130, 134 (2022)). Therefore, we do not address his third and fourth assignments of error arguing that the circuit court erred in terminating his parental rights: (1) "where delays caused by the abduction, the pandemic, [his] refusal to enter the United States illegally, and the appeals in this case were not culpable acts" by him; and (2) because the ICPC is "being circumvented by efforts to divert placement to an illegal alien."

Athey, J., concurring.

I agree with the majority that the circuit court erred in terminating father's parental rights. However, I write separately to note that this agreement extends only to the majority's analysis that the Department failed to provide clear and convincing evidence that father failed to remedy his situation under Code § 16.1-283(C)(2).  As this ground by itself is sufficient for reversal, I would not address father's remaining assignments of error as "[w]e have an 'obligation to decide cases on the best and narrowest grounds available,'" and resolving this matter under Code § 16.1-283(C)(2) is the best and narrowest ground for the resolution of this appeal.  *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023) (quoting *Esposito v. Va. State Police*, 74 Va. App. 130, 134 (2022)).

Callins, J., concurring in part, and dissenting in part.

As an initial matter, father brings four assignments of error for appellate consideration. First, father contends that the circuit court was without "legitimate subject matter jurisdiction." But father's arguments addressing this issue turn on a flawed understanding of subject matter jurisdiction as well as the relevance of the Hague Convention and the mechanisms by which the Convention is enforced. I agree with my colleagues that father has failed to show that the circuit court was "depriv[ed]" of "legitimate subject matter jurisdiction."

Second, father contends that "there was no clear and convincing evidence" that he "was an unfit parent." I disagree. Code § 16.1-283(C)(2) requires that a circuit court consider the best interests of the child as well as other factors when terminating residual parental rights. But whether the evidence presented at the termination hearing regarding the child's best interests reached the "clear and convincing" threshold is not a determination that we, as an appellate court, can make sitting in review of the circuit court's judgment. Indeed, a circuit court, "[i]n its capacity as factfinder, . . . retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 266 (2005)). And here the circuit court's judgment regarding the child's best interests was based on evidence heard *ore tenus*. Hence, the *only* consideration before us is whether the circuit court's findings regarding the best interests of the child were plainly wrong or without evidence to support them. *See id.* ("The [circuit] court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991))). Because evidence was presented as to father's history of abuse and aggression on which the circuit court could rely in finding that termination of father's parental rights was in the best interests of the

child, the circuit court's findings were not plainly wrong or without evidence to support them. Thus, I would affirm the circuit court on this point. Moreover, as explained *infra*, father's arguments as to how the other factors delineated by Code § 16.1-283(C)(2) were applied to this case are waived under Rule 5A:20(e).

Third, father argues that the "delays caused by the abduction, the pandemic, [his] refusal to enter the United States illegally, and the appeals in this case were not culpable acts by [father] and cannot be used to conclude that the child's need for finality requires termination." But the arguments father presents on brief addressing this assignment of error are sufficiently vague— and skeletal—as to invite this Court "to research [and] construct" father's "arguments for him." *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017) (quoting *Sneed v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010)). This we cannot do. Accordingly, I would find that father's arguments fail to meet the requirements of Rule 5A:20(e) and are, therefore, waived.

Fourth, father argues that the "Interstate Compact for the Placement of Children [wa]s . . . circumvented by efforts to divert placement [of the child] to an illegal alien." To the extent that my colleagues in the majority find that this argument does not merit our consideration and since father's argument on this point fails to comport with the strictures of Rule 5A:20(e), I agree.

Among these four assignments of error are two about which my colleagues and I disagree. It is on these assignments of error that I focus in the analysis that follows.

## I. Father's Second Assignment of Error

Father contends, under his second assignment of error, that "there was no clear and convincing evidence [that he] was an unfit parent, thus violating his Due Process rights under the Fourteenth Amendment to the United States Constitution, Article I Section 11 of the Virginia

Constitution, and Section 16.1-283 of the Code of Virginia."[15]  On brief, father argues, among

other things, that "the evidence for this termination is insufficient as a matter of statutory law,

and it must be reversed on that ground."  Father asserts, "[t]he presumption favoring a natural

parent has not been overcome," since "[t]here was no clear and convincing evidence that . . .

father's parental rights to this child should be interfered with, much less terminated."  Father

argues that, instead, the evidence presented at the termination hearing constituted "unspecified

and unadjudicated allegations of abuse by . . . father to the mother," one of which such

allegations, father emphasizes, he "denied . . . under oath."

Father's arguments are unavailing.  First, father's second assignment of error is lacking in

precision.[16]  As drafted, it asserts that "the [circuit] court erred in terminating [father's] parental

---

[15] As our Supreme Court held in *Knox v. Lynchburg Division of Social Services*, 223 Va. 213 (1982), Code § 16.1-283(C)(2) passes constitutional muster.  *Id.* at 223-24 (rejecting appellant's arguments that Code § 16.1-283 "is invalid because (1) it denies substantive due process by permitting termination in the absence of a compelling state interest, (2) it is unconstitutionally vague, and (3) it permits termination of parental rights on proof by a mere preponderance of evidence").  Rather, Code § 16.1-283(C)(2) delivers to parents the process they are due under the United States Constitution as well as the Virginia Constitution.  *See Rader v. Montgomery Cnty. Dep't of Soc. Servs.*, 5 Va. App. 523, 526 (1988) ("The statutory scheme for the constitutionally valid termination of residual parental rights in this Commonwealth is primarily embodied in Code § 16.1-283.").  Understanding this, father argues, on brief, that "[d]ue process requires a [circuit] court to strictly comply with the applicable statutory scheme for the disposition of child custody cases."  *See id.* ("These procedures must be strictly followed before the courts are permitted to sever the natural and legal bond between parent and child.").

[16] What is more, father's second assignment of error appears not to have been preserved.  Father includes in his opening brief page references for four locations in the record where the error outlined in this assignment was stated.  Two of the four locations—father's motion to strike and father's closing argument—do not include arguments that track or reflect with specificity father's second assignment of error.  The other two locations correspond with a pleading document titled "Appellant's Objections to Termination of Parental Rights and Permanency Planning Orders," dated December 1, 2022.  The pleading was stamped as filed on December 2, 2022, more than two weeks after the circuit court entered the permanency planning order on November 14, 2022.  Father's notice of appeal, stamped as filed December 5, 2022, was also signed by counsel on December 1, 2022.

Rule 5A:18 provides that "[n]o ruling of the [circuit] court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty *at the time of the ruling*."  (Emphasis added).  Here, father's objections were filed *weeks* after the ruling, almost

- 21 -

rights and in the accompanying permanency planning orders approving goals other than return home to him, where there was no clear and convincing evidence [father] was an *unfit* parent." (Emphasis added). But Code § 16.1-283(C) does not require that a circuit court make a finding as to a parent's fitness. And the circuit court did no such thing here. *See* Code § 16.1-283(C)(1)-(2) (providing that "[t]he residual parental rights of a parent" may be terminated where "the court finds, based upon clear and convincing evidence, that it is in the *best interests of the child*" and certain other conditions are met (emphasis added)).

Nevertheless, a circuit court's "determin[ation] that the factors listed in Code § 16.1-283(C)(2) existed" is "tantamount to a finding of parental unfitness," making "separate finding[s] of unfitness . . . [un]necessary." *Helen W. v. Fairfax Cnty. Dep't of Hum. Dev.*, 12 Va. App. 877, 885 (1992) (citing *Harris v. Lynchburg Div. of Soc. Servs.*, 223 Va. 235, 241 (1982)). Here, the court found that

> the Department has met its burden to establish by clear and convincing evidence that termination of your residual parental rights pursuant to Virginia Code Section 16.1-283(C), that the petition should be granted along with the petition for permanency planning order with the goal of adoption and relative placement.

Hence, because the circuit court found that the factors in Code § 16.1-283(C)(2) existed, and this finding was tantamount to a finding of parental unfitness, father's assignment of error, which asserts that "there was no clear and convincing evidence [father] was an unfit parent," can be

---

simultaneous with father's notice of appeal. Rule 5A:18 "afford[s] the trial judge an opportunity to rule intelligently on objections," "at a point in the proceeding when the [circuit] court is in a position . . . to consider the asserted error [and] rectify the effect of the asserted error." *Moison v. Commonwealth*, 302 Va. 417, 419 (2023) (first, third, and fourth alterations in original) (quoting *Maxwell v. Commonwealth*, 287 Va. 258, 264-65 (2014)). The referenced document afforded the circuit court no such opportunity. Moreover, father did not, between noting his objections and filing his notice of appeal, request a hearing on the objections or move for reconsideration.

construed as contending that the evidence was insufficient to support the circuit court's finding regarding the subject factors.

The first such factor is the best interests of the child. *See* Code § 16.1-283(C)(2). The circuit court observed,

> not one person who was interviewed who knows [father] the best, your parents, your children, your older children, and I think there were some others that were interviewed. Not one gave the opinion that you were fit to care for [the child], that you understood his or could provide for his developmental, his emotional, his educational, his medical needs. And in fact, the home study was replete with statements about the physical and verbal aggression exhibited by you.

The circuit court then further found that,

> while your son, [C.G.], as hard as it was to have to listen to his testimony, he didn't -- in my view, he was credible because I didn't see any exaggeration in this testimony. He only identified one episode of actually observing you be physically violent towards his mother.[17] But he also testified about having to experience and bear physical violence by you against him.
>
> And then he also described at least one inciden[t] of you punishing [the child] in what this Court would find a completely inappropriate way.

The circuit court could make the above-referenced evidence the basis for its finding that it was not in the best interests of the child for father to retain his residual parental rights. And such finding was neither plainly wrong nor without evidence to support it. Rather, the circuit court's observations and finding were tightly moored to evidence in the record.

The Department of Social Services' foster care service plan review, which was included in an exhibit introduced at the hearing, stated that the child's "grandparents do not recommend his return to Honduras as they do not believe [father] is capable of parenting [the child] and

---

[17] According to the record, C.G. testified to a single instance where both C.G. and the child were present and witnessed father grab the mother by her neck and throw her on the sofa before slapping her.

- 23 -

providing for his emotional, educational, and medical needs." The review also stated that father's "parents and two children live together in a home separate from" father and that father's "children have reported that they do not have a good relationship with their father." One of father's children, C.G., testified at the termination hearing. C.G., who lived with father for 14 years, testified, among other things, that he observed "physical, and verbal aggression" by father "[f]requently," that father "would hit" mother, level "[i]nsults, words," and that the physical abuse happened in front of father's children. One incident, C.G. testified, happened in front of the child when he was two years old; after, the child reported the incident to his grandparents. In response, father "got angry" at the child and "made him kneel" for "about ten minutes." C.G. also testified that father was physically aggressive toward C.G.'s grandmother "the same time that he broke my mother's eyebrow." Although C.G. testified that father was not abusive toward him or his brothers, he responded "Yes" when asked, "did your father ever hit you?," and averred that father would hit him "[w]ith a belt . . . with rope." Similarly, the home study noted, "It is important to mention that what has been declared by [father] is not valid since the people who were interviewed have described [him] as an irresponsible and aggressive person who engaged in domestic violence against [mother]." Such people, the report continued, "established that [mother] has been the person responsible for the financial and emotional wellbeing of the boys."

Next, in finding that circumstances warrant the termination of the residual parental rights of a parent, a circuit court must also find that other conditions delineated under Code § 16.1-283(C)(2) are met. *See* Code § 16.1-283(C)(2) ("The parent . . . without good cause, ha[s] been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and

appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.").  Father seems to argue that such conditions were not met in this case.  Specifically, father points out that "[t]he best interests of the child are NOT the only thing that must be proven under the statute," and later notes that the statute "deals with the remedying of conditions."  Rather than explain how or why such conditions were not met here, father poses a rhetorical question, "But what were the conditions that needed to be remedied under Subsection 16.1-283(C)(2)?"  Beyond posing this question, father supplies no further argument on this point, much less elucidates how or why the circuit court erred in its application of Code § 16.1-283(C)(2).  Instead, father's question appears to invite this Court to make such arguments for him.[18]  But the burden of argument is not for this Court to carry—it rests with father alone.  Thus, I would find that father's argument regarding whether he had substantially remedied the conditions that led to the continuation of the child's foster care placement is waived.  *See Bartley*, 67 Va. App. at 744 ("Rule 5A:20(e) requires that an appellant's opening brief contain '[t]he principles of law, the argument, and the authorities relating to each question presented.'  Unsupported assertions of error 'do not merit appellate consideration.'" (alteration in original) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008))).

---

[18] Indeed, my colleagues in the majority appear to have accepted father's invitation, elaborating in detail the conditions father was to have met, and finding, ultimately, that "the only evidence before the circuit court that father had not remedied the situation requiring the child's continued foster care placement was the Department's opinion that father had not sufficiently modified how he participated in virtual visits with the child."  On this basis, my colleagues find that "[t]his is not clear and convincing evidence that the father failed to remedy the situation requiring the child's continuation in foster care," that such finding is without evidence to support it, and that "[t]he mere fact that father did not modify his communications with his son can hardly satisfy the heavy burden of showing by more than a mere preponderance that the parenting classes had not improved father's identified parenting deficiencies."  Yet, father makes none of these arguments.  Moreover, although framed with reference to the correct standard, my colleagues appear to reweigh the evidence rather than consider whether *any* evidence supported the circuit court's finding.

- 25 -

Accordingly, I would find the arguments father marshals under his second assignment of error fail to establish that the circuit court committed reversible error. *See Stockdale v. Stockdale*, 33 Va. App. 179, 185 (2000) ("The burden is on the party who alleges reversible error to show that reversal is justified." (quoting *D'Agnese v. D'Agnese*, 22 Va. App. 147, 153 (1996))).

## II. Father's Third Assignment of Error

Father's third assignment of error asserts that "delays caused by the abduction, the pandemic, [father's] refusal to enter the United States illegally, and the appeals in this case were not culpable acts by [father] and cannot be used to conclude that the child's need for finality requires termination." In so asserting, father appears to contend that he had "good cause" to have been unable "to remedy substantially the conditions which led to or required continuation of the child's foster care placement." Code § 16.1-283(C)(2). However, this is not what father argues on brief. Instead, father simply states that "[s]ome degree of fault is relevant to all termination cases, but none was proven here." Although father does cite to two circuit court opinions to support this proposition, father fails to elaborate, with specificity or even in outline, the significance of this "fault" argument—or the noted delays—with specific reference to Code § 16.1-283(C)(2).

Instead, father's argument that "[s]ome degree of fault is relevant to all termination cases, but none was proven here," operates at a high level of generality and addresses none of the specific facts of this case. Such argument serves as an invitation to this Court to fill in the gaps, making this Court into "a depository in which" to "dump the burden of argument and research." *Fadness v. Fadness*, 52 Va. App. 833, 850 (2008) (quoting *Jones*, 51 Va. App. at 734). In other words, father's argument displaces the burden of research and argument to this Court, turning this Court into "an advocate for, as well as the judge of the correctness of, [appellant's] position

- 26 -

on the issues he raises." *Id.* (alteration in original) (quoting *Jones*, 51 Va. App. at 735). With father having made only a "skeletal argument," *Bartley*, 67 Va. App. at 746 (quoting *Sneed*, 301 S.W.3d at 615), thrusting this Court into the role of advocate for and judge of the positions he raises, I am compelled to find that the argument father makes under his third assignment of error is waived.

Even so, the arguments father raises across his four assignments of error raise issues that should not go unremarked. Not least among these issues is father's status as a non-citizen, non-resident; the seeming barriers, some apparently insuperable, that may have impinged on father's ability to remedy substantially the conditions that led to the child's continued foster case placement; the geography of economic privilege and how such privilege may inflect the record here; and, notably, the absence of adjudication under the Hague Convention. Each referenced issue is a cause for pause. But this Court may not push aside procedural defects, mis-calibrated arguments, or appellant-made errors in an effort to reach out and grab meritorious issues. Nor may this Court use its position to advocate for parties or make decisions on the basis of policy considerations. *Cf. Payne v. Payne*, 77 Va. App. 570, 589-90 (2023). Understanding this, I must respectfully dissent.